Jerry Lee HOGUE, Appellant,

v.

The STATE of Texas, Appellee.

No. 68852.

Court of Criminal Appeals of Texas, En Banc.

March 19, 1986.

Will Gray, Houston, for appellant.

Tim Curry, Dist. Atty. & C. Chris Marshall, Rufus Adcock & Joe C. Lockhart, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

This is an appeal from a conviction of capital murder. Punishment was assessed at death.

Briefs have been filed on behalf of appellant by his court-appointed counsel and by his subsequently retained counsel with the permission of the trial court. We will consider the grounds of error raised in both briefs. In addition, appellant has filed a pro se brief which raises additional issues not briefed by counsel. Without discussing individually the issues raised in appellant's pro se brief, we note that we have carefully reviewed his contentions and find them to be without merit.

The evidence introduced at trial showed that appellant and his wife rented a house located at 2412 Southcrest in Arlington on November 9, 1978. Approximately one month later, on December 4, 1978, appellant and his wife vacated the house without turning in their key, leaving a refrigerator, a round wall ornament and some trash. The property was cleaned up and on December 24 the house was leased to Mary Beth Crawford and Jayne Markham. Living at the house with the two women were Markham's eight-year-old son and Steve Renick, a friend of the women.

On a Wednesday, January 10, two days before the commission of this grisly and brutal crime, appellant returned to the house. When Markham answered the door, appellant told her he had lived in the house and had left a wall hanging at the house and asked if he could get it. Mark-

ham let appellant in the house and they began conversing. Apparently some sort of amiable relationship between Markham and appellant was struck because appellant stayed at the house for quite a long time that evening. On Thursday, appellant again showed up at the house. Markham had agreed to buy some used furniture from appellant so she went with him to pick up the furniture. When they arrived back at the house, once again appellant stayed for the duration of the evening. Eventually the women went to bed and only appellant and Renick were awake. Appellant asked Renick if he knew where he could get a gun. Renick showed appellant the gun he kept in his footlocker. After cleaning the gun, Renick loaded it and placed it back inside the footlocker.

Appellant was at the house again early the next morning.[1] Renick went to work and Crawford took Markham's son to school. On her way home she stopped at the grocery store. When she returned home, she prepared breakfast for herself, Markham and appellant. Crawford noticed that Markham seemed upset. While the trio were eating breakfast, appellant suddenly blurted out that he was a police officer and that he was arresting them for possession of marihuana. When the women asked for some sort of identification, appellant said that he did not have any with him but that his real purpose was to arrest Steve Renick because he was a heroin dealer. Appellant told the women to cooperate, to stay in his sight all day long and not to talk to each other. He then had them go into Markham's bedroom. Appellant left the bedroom and shortly thereafter the women heard a breaking noise. They followed the noise and found appellant going through Renick's footlocker.

Appellant found Renick's gun inside the footlocker. Appellant pointed the gun at the women and told them he was going to handcuff one of them. He proceeded to handcuff Markham; he put Crawford into a closet. After a period of ten minutes, appellant opened the closet door. He had the gun in his hand and was nude from the waist down. Appellant stepped inside the closet, pointed the gun at Crawford's head and instructed her to remove her clothes. When Crawford replied that she would not and she had venereal disease, appellant backed out of the closet and shut the door.

A short while later appellant removed Crawford from the closet and led her into the dining room. There she saw Markham nude and blindfolded, lying face down on the floor with her hands cuffed behind her. Appellant told Crawford to remove all of her clothes except her underwear and to lie down beside Markham. After a few minutes, appellant forced Crawford to commit oral sodomy upon him. Thereafter, appellant again put the women in the bedroom. Crawford was put back into the closet while appellant raped Markham. Then appellant blindfolded both women and forced both of them to lay on the bed. He then proceeded to go through Markham's purse.

Appellant later permitted both women to get dressed. He instructed the women not to talk to each other and at a point during the day when he caught the women talking he took Crawford into her room and handcuffed her to her bed. At 3:15 p.m., Markham's son returned home from school. Appellant made him go to his mother's room and remain there. Around 6:00 p.m., Renick came home. Appellant, carrying the gun and a pair of handcuffs, met Renick at the front door. Renick was immediately handcuffed and led into Markham's bedroom. Appellant told Renick that he was a narcotics agent and was arresting him. Appellant took Renick's wallet and then moved Renick into Crawford's bedroom where he was handcuffed to the bed. Over the next few hours appellant moved

---

1. Although not clear from the evidence, appellant may have spent the night at the house. Mary Beth Crawford testified that she was awakened Friday morning to the sound of appellant's voice telling Steve Renick it was time to go to work. Renick testified that appellant was still there when he went to bed that night. Renick testified that he did not know if appellant had spent the night at the house, but he testified that appellant woke him up Friday morning.

through the house, shuffling his prisoners from room to room. Throughout the evening appellant made numerous threats to kill them all. At one point appellant led Crawford into the living room and had her sit on the couch. Appellant left the room and when he returned he was carrying a butcher knife. He stabbed Crawford in the stomach and then dragged her into a bathroom. A short time later, he had both women go back into the living room. There he told them he was a hit man and had a contract out for each one of them. Appellant then took Crawford into the third bedroom. By this time Crawford was bleeding heavily, was in intense pain, and was passing in and out of consciousness.

Appellant brought Markham into the room where Renick was now confined. By this time Renick's hands had been tied to the headboard and his feet had been bound together. Appellant proceeded to bind Markham by tying her hands behind her back, tying her feet together and then taking a wire and tying her feet to her hands. When Renick and Markham begged appellant to release them so that they could take Crawford to the hospital, appellant said he was a hit man and he was going to kill them all. Appellant left the room. Soon the victims began to smell gasoline. They could hear the appellant in the attached garage coughing and sputtering. After a while appellant came back into the bedroom carrying a Prestone antifreeze can and a rolled up newspaper. Appellant again told Markham and Renick that he was going to kill them all. He then left the room. The victims saw appellant backing down the hallway, pouring a liquid out of the antifreeze can. They soon began to smell gasoline. Suddenly, fire roared through the hallway and flames began shooting into the bedroom where Renick and Markham were tied up.

Renick managed to free himself, break a window and jump outside. He then tried to go back in and rescue Markham who was screaming but the flames were too intense. When the screaming stopped, he ceased his efforts. He then ran to the window of the bedroom in which Markham's son was sleeping. He was able to pull the child out of the window. Crawford, awake at the time of the fire's ignition, managed to jump out of a bedroom window. She ran next door to summon help. On her way to the neighbors, she saw appellant climbing into his car. She ran to the neighbors' house and rang the doorbell. The neighbors found her collapsed on the ground.

Emergency vehicles responded to the fire call at 1:14 a.m. when they reached the scene, the house was fully involved. Markham's body was found by fireman inside the house. Her hands and feet had been tied behind her back, leaving her body in a crouched position. An autopsy showed that her hands and feet were tightly bound with insulated wire.

Police found a Prestone antifreeze container sitting just inside the doorway of the laundry room. It smelled heavily of gasoline. They also found two sections of garden hose on the floor of the garage lying next to a vehicle that had been parked in the garage. These also smelled of gasoline. A fire investigator concluded that more than two gallons of gasoline had been used to start the fire. He determined that the fire had been deliberately set.

■ Appellant argues that the court erred in submitting the issue of capital murder to the jury because the evidence was insufficient to prove the aggravating element of arson. Appellant contends that rather than proving a murder occurring in the course of committing an arson, the State's evidence showed a murder by arson.

A grand jury returned a three count indictment against appellant. The first count of the indictment charged that appellant "did then and there intentionally cause the death of an individual, Jayne Lynn Markham, by setting fire to the house occupied by the said Jayne Lynn Markham, and as a result of the said fire, the death of the said Jayne Lynn Markham was caused by asphyxiation due to smoke and carbon monoxide and caused by conflagration to the body of the said

Jayne Lynn Markham, and the death of the said Jayne Lynn Markham was intentionally committed in the course of committing and attempting to commit the offense of arson; ..."

Count two alleged a murder in the course of committing a kidnapping. Count three alleged V.T.C.A., Penal Code, Section 19.-02(a)(1) murder by arson. The court charged the jury in accordance with the first count of the indictment. Appellant voiced no objection to this aspect of the court's charge. Thus, no error is preserved. Nevertheless, we will discuss the merits of appellant's argument.

At the time of the commission of this offense, V.T.C.A., Penal Code, Section 19.-03(a)(2), provided that capital murder occurred when an individual intentionally committed murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated rape, or arson.

V.T.C.A., Penal Code, Section 28.02(a) defined arson as follows:

> "(a) A person commits an offense if he starts a fire or causes an explosion:
> "(1) without the effective consent of the owner and with intent to destroy or damage the owner's building or habitation; or
> "(2) with intent to destroy or damage any building or habitation to collect insurance for the damage or destruction."

Obviously, no evidence was introduced at trial regarding Section 28.02(a)(2), so for the purpose of our discussion, we consider the offense as defined in Section 28.-02(a)(1).

In their commentary to Section 28.02, supra, Searcy and Patterson write the following:

> "Arson is graded a second-degree felony unless any person, presumably including the actor, suffers bodily injury less than death as a result of the arson. In that event, it is a first-degree felony. In

effect, arson and an assaultive offense are consolidated and the punishment enhanced. If death occurs, arson is only a second degree felony. Causing the death, however, ordinarily would constitute murder under Section 19.02(a)(3) and be punishable as a first-degree felony. *If the actor intended to murder, the offense would be a capital felony under Section 19.03(a)(3)* [sic]."[2] (emphasis added).

From reading the above, it is clear that capital murder—arson occurs only when the appropriate mens rea is satisfied: an intent to murder *and* under the fact of this case an intent to destroy or damage the owner's building without the effective consent of the owner. Appellant maintains that since there was only one fire, there was only one act and thus only one criminal intent. Appellant is wrong on both counts.

Clearly there were two intents—an intent to kill his victims and an intent to destroy or damage the property. The first intent is evidenced by the numerous times appellant told his victims that he was going to kill them. Indeed, the actions of appellant in binding Renick and Markham, and incapitating Crawford by stabbing her with a butcher knife and then setting the house on fire clearly show an intent to kill. The act of setting the house on fire is proof of his intent to commit arson, that is, destroying or damaging the owner's building.

As far as appellant's argument concerning one act—once again appellant is in error. The evidence showed not only that appellant set the house on fire, but also that he tightly bound the hands and feet of the deceased and then bound them together. Had appellant not restrained the deceased in such a manner, she would have been able to escape. The evidence clearly shows two acts.

We find that the State clearly proved the commission of a capital murder. This ground of error is overruled.

**2.** Effective September 1, 1979, the statute was amended to make the offense a first degree

felony if bodily injury or death is suffered by any person.

■ In his next ground of error, appellant argues that his motion to quash the indictment should have been granted because the indictment failed to allege the manner in which the aggravating element of arson was alleged to have been committed. A similar contention was answered adversely to appellant in *Smith v. State*, 540 S.W.2d 693 (Tex.Cr.App.1976), a prosecution under the old Article 1257, V.A.P.C., in which Smith was charged with committing murder during the commission or attempted commission of a robbery. This Court found that an indictment need not allege the constituent elements of a felony which the defendant was committing or attempting to commit at the time of the homicide charged in the indictment. Although *Smith* did not involve a motion to quash, the holding in *Smith* was extended to cases involving a motion to quash in *Hammett v. State*, 578 S.W.2d 699 (Tex.Cr. App.1979). See also *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App.1976). Although the above cases involved capital murders committed in the course of robberies, we have found no reason that the rule should not apply to an indictment alleging capital murder committed in the course of arson. Appellant's ground of error is overruled.

In his next ground of error, appellant argues his motion to quash should have been granted because the wording of the indictment was illogical. The indictment reads in pertinent part as follows:

"Jerry Lee Hogue ... did then and there intentionally cause the death of an individual, Jayne Lynn Markham, by setting fire to the house occupied by the said Jayne Lynn Markham, and as a result of the said fire, the death of the said Jayne Lynn Markham was caused by asphyxiation due to smoke and carbon monoxide and caused by conflagration to the body of the said Jayne Lynn Markham, and the death of the said Jayne Lynn Markham was intentionally committed in the course of committing and attempting to commit the offense of arson; ..."

Appellant argues that the phrase "the death of the said Jayne Lynn Markham was intentionally committed...." does not make sense because the act of death cannot be committed; it occurs or is caused.

"In construing indictments the context and subject matter in which the words are employed should be taken into consideration. *Thompson v. State*, 69 Tex. Cr.R. 31, 152 S.W. 893 (1913). Grammatical errors present no grounds for the quashing of an indictment, unless such errors render the indictment uncertain and one is unable to determine the charge intended. *Stephens v. State*, 69 Tex.Cr.R. 437, 154 S.W. 996 (1913)." *Butler v. State*, 551 S.W.2d 412 at 413 (Tex.Cr.App.1977).

It is clear that when the complained of phrase is read in context that the indictment is alleging that the appellant intentionally caused the death of the victim while in the course of committing and attempting to commit arson. We fail to see how the wording of the indictment, although not grammatically correct, misled or confused appellant.

■ Next, appellant argues the indictment is insufficient because it merely alleges that he committed an intentional killing rather than specifically alleging that he committed murder. Since an intentional killing could be voluntary manslaughter, appellant argues that the indictment fails to allege a capital murder, pursuant to V.T.C.A., Penal Code, Section 19.03. Our review of the record in this cause shows that nowhere in either his initial motion to set aside the indictment or in his second motion to quash the indictment was this objection to the indictment pled; nor can we find anywhere in the record where such an argument was presented to the trial judge. Thus, nothing is presented for review. *Arnold v. State*, 573 S.W.2d 816 (Tex.Cr.App.1978); *American Plant Food Corporation v. State*, 508 S.W.2d 598 (Tex. Cr.App.1974).

Furthermore, appellant's argument is faulty in that voluntary manslaughter is not just an intentional murder but an inten-

tional murder with the additional condition that the defendant "caused the death under the immediate influence of sudden passion arising from an adequate cause." V.T.C.A., Penal Code, Section 19.04. In order for appellant's argument to be successful, the indictment would have had to contain that additional conditional allegation. As worded, the indictment sufficiently alleged the offense of capital murder. This ground of error is overruled.

█ Appellant also argues that the trial court erred in allowing the State to impeach appellant with a non-final conviction during the guilt-innocence phase of the trial. Article 38.29, V.A.C.C.P., provides as follows:

"The fact that a defendant in a criminal case, or a witness in a criminal case, is or has been, charged by indictment, information or complaint, with the commission of an offense against the criminal laws of this State, of the United States, or any other State shall not be admissible in evidence on the trial of any criminal case for the purpose of impeaching any person as a witness unless on trial under such indictment, information or complaint a final conviction has resulted, or a suspended sentence has been given and has not been set aside, or such person has been placed on probation and the period of probation has not expired. In trials of defendants under Article 36.-09, it may be shown that the witness is presently charged with the same offense as the defendant at whose trial he appears as a witness."

In the instant case, the State introduced evidence that appellant entered a plea of guilty and was convicted of rape in Cause No. 6785 in the District Court for the County of Boulder, State of Colorado on September 23, 1974, and was assessed a prison term not exceeding three years. Out of the presence of the jury, defense counsel showed that appellant served time in the Colorado State Reformatory from September 23, 1974, to December 23, 1974. On December 23, 1974, pursuant to appellant's motion for a sentence modification, he was released from the Reformatory and placed on probation for a period of two years. On August 6, 1975, a complaint was filed by the probation department alleging that appellant had violated his probation. On December 8, 1975, a hearing was held on this complaint and a finding was made that appellant had violated his conditions of probation. The Colorado court ordered that appellant's sentence of an indeterminate term not to exceed three years be reimposed. Appellant was sent back to the Colorado State Reformatory to resume serving his sentence. Two months later, appellant filed another motion to modify the sentence. In a hearing held on March 1, 1976, the Colorado court ordered that the balance of appellant's sentence be suspended and appellant was placed back on probation for ten months, December 23, 1974, being the expiration date. Another complaint alleging that appellant had violated the conditions of his probation was filed on September 7, 1976. However, on January 6, 1977, an order was entered withdrawing that complaint and discontinuing further supervision of appellant in that his period of probation had expired.

Appellant argues that such evidence shows that appellant successfully completed the probationary period given to him by the Colorado court and thus evidence of his conviction was inadmissible under Article 38.29, supra.

We have reviewed the briefs of both parties and agree with the State that the situation presented in the instant case is not the type envisioned by the drafters of Article 38.29, supra. First of all, appellant did not get "probation" as we know it in Texas. The evidence introduced by appellant shows that at the time of appellant's original sentencing on September 23, 1974, the Colorado court considered appellant's application for probation and denied it. Furthermore, the order dated December 23, 1974, indicates that the court placed appellant on probation, not because of his record before his conviction, but rather as a direct result of his behavior during his incarceration at the Colorado State Reformatory.

The State would ask that we characterize the initial probation given to appellant as a type of "shock" probation. However, we decline to do that or to answer the question of how Article 38.29 applies to Texas "shock" probation. We do not reach these questions because we find that after appellant was placed on probation it was revoked due to the violation of probation conditions. Thereafter, appellant was reincarcerated. His release on his second "probation" was not probation as we know it. The court did not set aside his entire sentence, but rather suspended the "balance" of appellant's sentence. Thus, the conviction became final on December 8, 1975, when appellant's first probation was revoked and he was incarcerated. *Roliard v. State*, 506 S.W.2d 904 (Tex.Cr.App.1974). The following period of incarceration between December 8, 1975 and March 1, 1976 was never affected by the second probation order. This second probationary period may be likened to what we in Texas know as parole or mandatory supervision. Article 42.12, Section 2, V.A.C.C.P.

This is clearly not like the situation presented in *Van Sickle v. State*, 604 S.W.2d 93 (Tex.Cr.App.1980) (Opinion on Rehearing), where the record showed that after Van Sickle pled guilty to grand larceny in Oklahoma, the Oklahoma court deferred the judgment of guilt and placed Van Sickle on probation. When Van Sickle successfully completed the probation, his case was discharged without a judgment of guilt and his plea was expunged from the record. This Court found that the Oklahoma charges did not amount to a final conviction under Article 38.29, supra. Unlike appellant, Van Sickle never was adjudged guilty and more importantly, he never served time as a result of that conviction. Nor is the instant case like *Redman v. State*, 533 S.W.2d 29 (Tex.Cr.App. 1976), in which Redman's attorney attempted to impeach a State's witness. The record showed that the witness had pled guilty to a charge of child molesting in California. Thereafter, he was placed on two years' probation. At the completion of his term of probation, the witness' plea of guilty was withdrawn and the charge dis-

missed. This Court found that the witness' conviction was not a final conviction and thus could not be used for impeachment purposes. See also: *Wintters v. State*, 616 S.W.2d 197 (Tex.Cr.App.1981); *Thomas v. State*, 578 S.W.2d 691 (Tex.Cr.App.1979). We hold that no error was committed.

The next few grounds of error deal with the voir dire of the jury panel. Appellant argues that the trial court erred in not being neutral during the voir dire process. He lists several specific instances during which the judge allegedly aided the prosecution in either qualifying or disqualifying potential jurors by propounding slanted or incorrect statements of the law relating to the offense of murder. He further argues that while the State was allowed to challenge prospective jurors Atchley, Melanson, Johnson and Ruffin for cause because they would not consider the minimum punishment for murder, when he tried to challenge prospective jurors Hiller and Gattis, the trial court imposed a "more stringent test" which he was unable to meet. Thus, his challenges for cause were overruled and he was compelled to exercise a peremptory challenge on both men.

■ During questioning by the State, Atchley testified that a five year sentence for murder seemed "just a token amount for something that serious," and that "anything that's worth the trial would be more serious than five years." The State then challenged him for cause. On examination by the defense, Atchley stated that "it would depend on circumstances, of course, but as a rule of thumb, I would say I wouldn't go for a light sentence like that on a murder case." In an effort to clarify Atchley's position, the court then asked him what his position would be if he found that the defendant intentionally took another's life but there were a lot of extenuating circumstances. Atchley then replied:

"I think intentional is the key. Accidentally might be different, but intentionally taking a life, I don't believe I would for a five-year sentence."

Atchley was excused for cause.

During questioning by the State, Melanson also clearly stated that he could not

conceive of a fact situation where he could vote for the minimum of five years if the person had knowingly and intentionally killed another human being. He repeated his position upon examination by the defense. The court sustained the State's challenge for cause.

Prospective juror Johnson initially testified that she could not consider giving as little as five years where a person was found guilty of a knowing or intentional murder. During the examination by the defense she indicated that she could give five years in a case where there were other factors, such as accident or self-defense. When the State then clarified the law as applying to only a knowing or intentional taking of a human being's life, Johnson then repeated her position that she could not consider five years. The court then sustained the State's challenge for cause.

Finally, prospective juror Ruffin clearly testified during questioning by both the State and defense that if a murder was committed intentionally or knowingly he could not consider giving a punishment of five years.

Our review of the voir dire examination of the above jurors shows that all four were properly excused for cause. No where during the voir dire do we find any improper conduct on the part of the trial judge. Turning now to the jurors whom appellant claims should have been excused for cause, we find initially that the defense never attempted to challenge juror Gattis for cause. He testified without hesitation that he could consider giving a five year sentence in a murder case. After the State informed the court that they would accept Gattis as a juror, the appellant exercised a peremptory challenge on Gattis.

With respect to prospective juror Hiller, he first testified that he could not consider the minimum five year punishment for murder. Upon further examination, he testified that even though a murder was committed knowingly and intentionally, if there were mitigating circumstances, he could consider the minimum punishment. We find the court properly overruled appellant's challenge for cause.

Our review of the record shows that neither the trial judge nor the prosecutor propounded incorrect statements of the law to the members of the venire. Nor do we find any evidence at all that the trial judge engaged in improper conduct by imposing different standards for the two parties in regard to challenges for cause. The record does not support appellant's contentions. This ground of error is overruled.

■ In the next four grounds of error appellant argues that the court erred in excusing four prospective jurors in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).[3] Mary J. Porter initially testified that she was conscientiously opposed to the death penalty. Upon further questioning she testified as follows:

"Q. Now, this is a feeling—Even though you would only be answering questions, you would automatically vote against the imposition of capital punishment, no matter what the facts of the trial might show, because of your feelings?

"A. I think I would.

"Q. And the fact that you are answering questions vs. answering death or not, you know that Judge is going to assess a death penalty if you answer them both yes. Are you irrevocably committed then, against the imposition of capital punishment, without regard to the evidence that might result or develop in the trial of the case?

"A. Yes.

" * * *

"Q. So, you would vote against the death penalty, no matter what the evidence showed?

---

**3.** Although appellant frames his contentions regarding these jurors under the guidelines of *Witherspoon* and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), we have also evaluated his contentions under the standard announced in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

"A. Yes."

Appellant argues that prospective juror Porter was improperly excused under *Witherspoon* and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), when the trial judge asked the following:

"THE COURT: You haven't asked her the legal questions. Ask her the qualification questions.

I'll ask her. In other words, could you state under oath, which you would have to do to qualify as a juror—You must be able to say under oath, that I can decide these fact questions—in other words, those two questions that I mentioned this morning. You have to answer them whether it was deliberate, and whether there is a probability that he might commit acts in the future. You must be able to state under oath, to this Court, that you could decide those fact questions, knowing that the punishment could be life imprisonment or death, without this knowledge affecting your decision on those fact questions. Getting right back down to the death penalty question. Could you vote yes—

"THE JUROR: No, I could not.

"THE COURT: —on those questions, in any fashion? Could you vote yes—

"THE JUROR: No.

"THE COURT: —knowing that it would be a death sentence?

"THE JUROR: No.

"THE COURT: Now, turning it around, if you knew that he was going to get death, are you saying to me that there is no way that you would answer those questions, yes?

"THE JUROR: You're right.

"THE COURT: Any further questions?

"MR. ROE: No, Your Honor.

"THE COURT: All right. You are excused. ..."

Our reading of the questioning by the trial court indicates that although he alluded to the Penal Code, Section 12.31(b) oath, denounced in *Adams v. Texas*, supra, his actual question to the juror concerned how she would answer the Article 37.071(b), V.A.C.C.P., questions. We find that the juror was properly disqualified under *Witherspoon v. Illinois*, supra.

Herbert Andrew Doan, when asked how he felt about capital punishment, initially testified that he did not believe that he could give a defendant the death penalty. The prosecutor then explained the procedures used in determining punishment in a capital murder case. The following then occurred:

"Q. Would you automatically vote against the imposition of capital punishment—the death sentence—without regard to any evidence that might develop at the trial of the case before you? You would automatically vote against the death penalty?

"A. I would have to.

"Q. So, you are irrevocably committed, before the trial begins, to vote against the death penalty, regardless of what facts or circumstances might emerge in the course of the trial?

"A. Yes, sir."

Upon questioning by defense attorneys, Mr. Doan appeared to be hedging on his previous answer when the following occurred:

"Q. ... Now, can you imagine any case in which you would be willing to give the death penalty on?

"A. Well, if I was an eyewitness to it, I guess I could change my mind.

"Q. Of course, if you were a witness, you wouldn't be on the jury.

"A. Right."

However, further defense questioning elicited the following:

"Q. In a capital murder case, one in which those two questions would be asked you that have been read to you, the ones that Counsel just read awhile ago from the State's side—now, there is not any case at all—the facts would be so bad in the original case, and then you were proven beyond a reasonable doubt that that crime was done purposely by that individual, and then you

were further proved beyond a reasonable doubt that that individual would be likely to do that type of crime or some nature of violent crime in the future—now, you have been proven all of those things to your satisfaction beyond a reasonable doubt: Would you always vote 'No' on one of those in order to see that the death penalty wasn't given?

"A. I would."

* * *

"Q. Now, you mentioned awhile ago, Mr. Doan, that if you were the witness and saw it, actually saw the crime, you could consider the death penalty under those circumstances, didn't you?

"A. Yes, sir.

"Q. And, of course, as I explained to you, if you were a witness, of course, you couldn't be on a jury under those circumstances. But, if the State proved to you facts strong enough—that it proved in your own mind, strong enough to make it the same as if you were an eyewitness, could you then consider the death penalty?

"A. I doubt it.

"Q. Do you think that you could or—

"A. No, I don't believe I could.

"Q. In other words, your—

"A. I don't believe my conscience would let me."

The trial judge then excused Mr. Doan over appellant's objection.

Although Mr. Doan stated during questioning by defense counsel that he could give the death penalty if he had been an eyewitness to the crime, his later answers showed that no matter what the evidence showed he could not consider the death penalty. Reading his voir dire as a whole, we find that he was properly excused.

Jo Harley Scott equivocated at the beginning of her voir dire examination as to whether she could sit on a jury in a capital murder case which assessed the death penalty. However, as the prosecutor continued to question Scott, she became more firm in her answers that she could never impose the death penalty:

"Q. And as you sit here today, you would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before this Court?

"A. I believe that's right.

"Q. One more question, if I may: Are you, therefore, irrevokably committed, before trial, to vote against the death penalty, regardless of the facts and circumstances that might emerge in the course of the trial?

"A. Yes, I think so."

During defense counsel's examination of Scott, the defense attorney explained the Article 37.071(b), supra, questions and the procedure used in assessing punishment in a capital murder case. The following then occurred:

"Q. Do you feel than under those circumstances you could act as a juror in a death penalty case?

"A. No.

"Q. Could you answer those questions that I mentioned to you? Do you think that you would be able to answer those based upon the facts of the case?

"A. Knowing that if I answered 'Yes' that it would invoke the death penalty?

"Q. Yes.

"A. No.

"Q. You don't think you would be able to answer those questions?

"A. No."

Scott was then excused over the appellant's general objection. The above quoted testimony clearly shows that Scott was properly excused and *Witherspoon* was not violated.

Roger Whitaker told the court initially that due to religious convictions he could not vote for the death penalty. He then testified:

"Q. All right. Then, I take it that regardless of what the facts may be in a capital murder case, you could never vote for the death penalty?

"A. No, sir.

"Q. Is that right?

"A. That's right.

"Q. Now, then, let me ask you one or two more questions. I take it, then, sir, that you would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before you; is that right?

"A. Yes, sir."

During examination by defense counsel, Whitaker testified as follows:

"Q. Do you feel that you could answer those questions 'yes' if you were a juror in a capital murder case if the State proved them to you beyond a reasonable doubt, knowing that you would not want to be in that situation?

"MR. ADCOCK: Your Honor, again, may we object? I think Counsel should be fair with him and explain that a 'yes' verdict means death.

"THE COURT: All right. Answer the question.

"JUROR WHITAKER: I'm trying to think, sir, Your Honor.

"THE COURT: He is asking you whether or not you could answer the questions 'yes' knowing that the Court would have to impose a death penalty?

"MR. ROE: Just based upon the evidence.

"JUROR WHITAKER: I don't believe I could.

"* * *

"Q. Let me try to ask it point-blank: If you were on a capital murder jury—not this jury, just any jury—and you had already found a person guilty of capital murder, as I have explained it to you, and knowing the results of your answers—if both questions were answered 'yes,' then the man gets the death penalty; the Court gives him the death penalty—knowing that, could you sit on a jury and just answer those questions according to the evidence brought forth during the trial?

"A. I might answer them according to the evidence, but I would also look at

what my answer would be—would also reflect on that man's future, whether he would be put to death or life in prison. Personally, I cannot vote to put a man to death. I would rather see a man live as long as he can live on this earth, whether it's in prison or whether it's out of prison. I cannot see a man put to death, no way."

The trial court then questioned Whitaker further:

"THE COURT: Do you have such a compelling feeling against the death penalty that you would resolve to vote against it, even before the trial starts, regardless of what the fact shows from the testimony?

"JUROR WHITAKER: Yes, sir, because I don't believe it's in the hands of man personally to put a man to death.

"THE COURT: Would you automatically vote against the imposition of the death penalty without regard to any evidence that might be developed at the trial of the case?

"JUROR WHITAKER: Yes, sir.

"THE COURT: Can you definitely state that you would automatically vote against the imposition of the death penalty, no matter what the trial might reveal?

"JUROR WHITAKER: Yes, sir."

We find from our review of the record that Whitaker was not improperly excused. His answers to the questions of both parties and the trial court showed that he could not follow the law.

In his next ground of error appellant argues that the trial court erroneously overruled his challenge for cause to Floyd Harding after Harding testified that he would find an accused guilty even though the State failed to prove up venue, an essential element of a case.

During questioning by the State, the following occurred:

"Now, the Indictment in this case, the first count, capital count—omitting some of the formal parts—says that the Defendant, Jerry Lee Hogue, in Tarrant

County, Texas, on or about the 13th day of January, 1979, did then and there intentionally cause the death of an individual, Jayne Lynn Markham, by setting fire to the house occupied by the said Jayne Lynn Markham, and as a result of the said fire, the death of the said Jayne Lynn Markham was caused by asphyxiation due to smoke and carbon monoxide and caused by conflagration to the body of the said Jayne Lynn Markham, and the death of the said Jayne Lynn Markham was intentionally committed in the course of committing and attempting to commit the offense of arson.

"These are the allegations set out in that capital murder count. We have the burden to prove those to the jury beyond a reasonable doubt. We have the burden of proof to prove them all to the jury beyond a reasonable doubt. It's sort of a situation of, the State can't prove nine out of ten of those. We have to prove ten out of ten. That's the allegations, and that's as it should be. You would require us to prove ten out of ten of those, would you not, or however many there are?

"A. Yes.

"Q. As the law required?

"A. Yes.

"Q. For instance, one of the allegations is the date. We would have to prove that. One is the cause of death. We would have to prove that. One is Tarrant County, Texas. We would have to prove that. If we didn't prove something as simple as it happened in Tarrant County, Texas, you would be required by law to return a not guilty verdict. I take it you would hold us to prove every single one of them?

"A. Yes, sir."

During its examination of Harding, the defense attempted to explore this area further:

"Q. Now, our law sometimes is filled with technicalities, and I would ask you—one of the elements of this offense is that it took place in Tarrant County, Texas—I would ask you, if you believed every other element in that Indictment, that there was a fire set on purpose with the intention of causing the death of a person there in the house, and you believed all of that, but you believed that this offense took place in Dallas County, as opposed to Tarrant County—

"MR. ADCOCK: Your Honor, at this time, we're going to object. He's going into a particular element of the offense, and for that reason, we would object. Further, it is a misstatement of the law on venue as to the burden of proof. For that reason, we object.

"THE COURT: Oh, I'll let him answer it.

"BY MR. ROE:

"Q. Knowing that you had found that a person's life was taken intentionally through arson, but you found that it took place in Dallas County, as opposed to Tarrant County, and knowing that the law is, a not guilty would bar further prosecution, would you have any hesitation—knowing that the State had not met its burden on that particular element—of bringing in a verdict of not guilty?

"A. Yes, I would.

"Q. All right.

"MR. BORG: Your Honor, I would object to the form of the question, that it doesn't—

"MR. ROE: Well, Your Honor, it's a little bit late for him to object now.

"THE COURT: Just a minute. Go ahead and make your objection.

"MR. BORG: The form of the question is not—I don't think he informed the juror that this is one of the elements that the State must prove.

"THE COURT: I think he understands the question.

"JUROR HARDING: My charge as a juror would be to assess the facts, and the point that you brought up, as I understand it, would be a point of law.

"BY MR. ROE:

"Q. That is correct, and I believe that the Counsel that just stood up ex-

plained to you that proving Tarrant County is one of the elements of this offense, did he not?

"A. Uh-huh. He listed several, ten or so.

"Q. Okay. You feel that in good conscience, knowing that that would be the only element that was left out, and that the State—even though the State did not prove that to your satisfaction beyond a reasonable doubt—you would still feel compelled to bring in a verdict of guilty. Would that be a fair statement?

"A. That would be true. If that was the only one, if that was the only doubt in my mind, that's probably true.

"THE COURT: Let me ask you this: You understand the Court would instruct you that you must find all of the elements—you made the statement that you thought that proving in Dallas or Tarrant County would be a question of law. I'll tell you now that that would be a question of fact. Knowing that you have to find, as a question of fact, that it happened in this Court or—the court would instruct you in writing that you must find that—and if you hadn't found it, are you saying that you would have trouble following the law, and you could not follow the law?

"JUROR HARDING: No, I'm saying that if I was not so instructed and that was the only element that was left open to me as a judge, then I would probably throw it out. But, if it was instructed to me as a point of law that I must accept that as one of the facts, then I would have to do so.

"THE COURT: Well, you're instruction will be as follows, that if you find beyond a reasonable doubt that it happened in Tarrant County, or if you fail to find it, either one—it must be found that it happened in Tarrant County by you as a matter of fact. If you didn't find that, his question has put in the proposition that you found that it was over in Dallas and, of course, under the law, if you followed the Court's Charge, you would have to find not guilty if you did not find that it happened in Tarrant County.

"JUROR HARDING: That's true, if I was charged with that as being one of the facts that had to be found, as I understand it.

"THE COURT: You don't have to find it as a fact, but you would be the one that would have to decide it.

"JUROR HARDING: We would have to judge on whether that was a fact or not?

"THE COURT: Yes. Now, could you follow the Court's Charge along that line?

"JUROR HARDING: Sure.

"THE COURT: Go ahead, Counsel.

"BY MR. ROE:

"Q. Are you saying, then, that if that particular element was not proven, that you would have no hesitation—was not proven beyond a reasonable doubt—that you would have no hesitation in bringing in a verdict of not guilty?

"A. That's true, under the Charge of the Court.

"Q. So you're saying that the only difference is that if you weren't charged in that manner—

"A. If I wasn't charged in that manner, and I had to make up my own mind, then that would be a different story.

"Q. Now, knowing that if you couldn't follow the Court's instructions that you would not be a qualified juror in this case—in other words, if the Court instructed you that you had to find that before you could bring in a verdict of guilty, and you in your mind felt that, 'Well, I'm going to find him guilty, even though they have proved it happened over in Dallas County, then, of course, you would not be qualified. I'm asking you that, whether the Court instructed you in that manner or not, would your own conscience cause you to disregard that and be

biased and bring in a verdict of guilty anyway?

"MR. ADCOCK: Your Honor, at this time, we would object. The only question he can ask the prospective juror is that if he can follow the law as given to him by the Court. He is now coming in with a hypothetical situation.

"THE COURT: I'll sustain the objection.

"BY MR. ROE:

"Q. Could you follow the Court's Charge concerning the element as to where it took place—Tarrant County?

"A. Definitely."

At the conclusion of the examination, the defense challenged Harding for cause because of his statements concerning the burden of proof on venue. Before ruling on the challenge, the careful trial judge posed several additional questions to Harding in an attempt to fully understand his position:

"THE COURT: Is it clear to you that the Court would not charge you how to find the answer to that question? The Court would just charge you that you must find, if you do find, any guilt of this person, that before you could find him guilty, that you would have to find, as a matter of fact, that it happened in Tarrant County?

"JUROR HARDING: I understand.

"THE COURT: And there is no question in your mind about that?

"JUROR HARDING: That's the basis of the whole thing.

"THE COURT: You understand the Court is not telling you that I would charge you to find that it happened in Tarrant County? I would be charging you that you must find for yourself whether or not it happened in Tarrant County. As Counsel said, if it happened over in Dallas County, would you have any problem with saying, 'I find that it happened in Dallas County, and I find not guilty'?

"JUROR HARDING: If it was proven by the prosecutor that it did in fact—was done by the Defendant, and the act did occur, I wouldn't hesitate over that point—the fact that it was brought out that it was done in Dallas instead of Tarrant County.

"THE COURT: But if you were instructed that you must find, before you find him guilty, that it did happen here, could you follow that instruction?

"JUROR HARDING: Sure.

"THE COURT: All right. Your motion is overruled—your challenge.

"MR. ROE: Your Honor, because the Court has overruled our challenge, we're going to use a peremptory strike.

"THE COURT: All right. You're excused, . . ."

It is clear from examining Harding's response as a whole that he would follow the law and hold the State to its burden of proof regarding venue. We find no error.

In his next two grounds of error, appellant complains of error that occurred during the voir dire examination of juror Jimmy McClellan. He contends initially that his challenge for cause was erroneously overruled after McClellan testified that he favored the death penalty over a life sentence after an accused had been convicted of capital murder. Second, he argues that the trial court erroneously refused to allow him to determine whether or not McClellan was biased against the imposition of a life sentence for the offense of capital murder.

When McClellan was examined by the defense, the following occurred:

"Q. Now, just for the purpose of this question, let's just disregard that you have to answer two questions at the punishment stage of a capital murder case—just for this limited question: Do you feel that if a person is found guilty of capital murder, in the limited set of circumstances as set out here by the Court and by the State, do you feel that the only proper punishment for that offense should be the death penalty?

"A. I haven't thought about that. It would depend upon what the law requires, really.

"Q. Well, I just need to get your views here, so let's just kind of put the law to one side. Do you personally feel, regardless of what the law states, that if a person is found guilty of capital murder—in the limited set of circumstances where it is possible in our law—do you feel, as a person, that the only proper punishment for that type offense, where it's believed beyond a reasonable doubt that it was done, would be the death penalty?

"MR. ADCOCK: Your Honor, at this time, we would object. First, that's a binding question and, secondly, I think the question should be, would he answer the questions that would resolve in that type punishment in accordance to the facts. This is a factual situation.

"THE COURT: Sustained.

"MR. ROE: Your Honor, once again, we would fall back to Smith vs. State.

"MR. BORG: Your Honor, I don't think the gist of the State's objection is going into this man's feeling on capital punishment in the least. The gist of the objection is that Counsel is asking him to draft a statute as he would see it, and the law that the man would be asked to sit in a jury on would include both a life sentence and a death sentence. Mr. Roe's question seems to be asking him to draft a statute, and we think this gets a little far removed from the laws that are on this case, life or death, versus Mr. Roe going into the man's general feelings on the death sentence. We do not object to Mr. Roe going into the man's general feelings on the death sentence.

"MR. ROE: Your Honor, that's what I'm trying to get at. If the Court is saying that I can't ask him how he feels if a person is convicted of capital murder as to whether he feels the only proper punishment is the death sentence, then I will abide by the Court's ruling.

"THE COURT: I sustained the objection on it.

You understand the question is being asked you, and the Court wants to know, whether or not you have any prejudice against the death penalty law, that—in other words, if you went into this trial of this case as a juror, believing that a life sentence was the only proper punishment, that would not be following a juror's oath. If you went in there believing that the death penalty was the only punishment in a capital case, that would be unfair to this man over here.

"JUROR McCLELLAN: I'm aware of that.

"THE COURT: Because he has a right for you to approach this case with the idea of answering those questions where I, as the Judge would have to give him either a life sentence or a death penalty.

"JUROR McCLELLAN: Yes, sir.

"THE COURT: Of course, if your mind is such—and the only way to know that would be whether you would tell us or not. If your mind is such, 'Well, if I find him guilty of capital murder, I'm going to vote where he gets the death penalty,' well, you can see how unfair that would be.

"JUROR McCLELLAN: I agree with you, yes.

"THE COURT: Now, is your mind in such a position that you could, reasonably and sincerely, follow the law that I give you that says you can answer those questions, without regard to what he gets, and the Court is going to have to give him either a life sentence or a death penalty if you find him guilty and answer those questions.

"JUROR McCLELLAN: Right. I understand that, yes.

"THE COURT: Now, do you have any prejudice going into this case that says to you—and you've got a right to it. I don't want you to get the idea the Court is trying to chastise you or anything, because that is not true at all. Have you got any idea that just because you find a man guilty of capital

murder that you definitely out to reach a death penalty verdict, or could you consider both phases of the law that says you can answer those questions either way. If it falls life sentence, so be it. Do you understand what I'm getting at?

"JUROR McCLELLAN: So be it, yes, sir.

"THE COURT: Do you understand what I'm getting at?

"JUROR McCLELLAN: Yes, sir.

"THE COURT: Is there any confusion in your mind about it?

"JUROR McCLELLAN: No.

"THE COURT: Go ahead, Counsel.

"BY MR. ROE:

"Q. Now, let me get back to what you personally believe, once again, regardless of what the law states. Do you personally believe that if a person is convicted of capital murder, if you were on a jury and you believed beyond a reasonable doubt that the only proper punishment, regardless of what the law states, would be the death penalty?

"A. Again, it would depend upon the facts.

"Q. So, I take it that you would not automatically vote for the death penalty?

"A. No.

"Q. In a capital murder case?

"A. No.

"Q. And I take it that you can think of a set of circumstances where a person was convicted of capital murder beyond a reasonable doubt where a life sentence would be proper?

"A. Could you give me an example?

"Q. No, I can't, under our law.

"A. Yes.

"Q. But can you, as you're sitting there, can you conceive of a set of circumstances, whatever they might be, where you personally, regardless of what the law states, would feel in your heart that it was proper that a person got a life sentence when he was convicted of capital murder, as opposed to the death penalty?

"A. I can't think of anything right now.

"Q. Now, if you were selected on a capital murder jury, and you found the person guilty of capital murder, as our law states, and you believed that the State proved each and every element beyond a reasonable doubt, which they would have to do before you would even get to that stage, do you think that knowing what two possible punishments are—either life or death—do you think that knowing those two punishments would affect you in any way, as far as answering those questions is concerned—say, if you wanted to get to a death sentence, or if you wanted to get to the life sentence? Do you think that knowing what those two punishments are would affect you in any way in answering those questions?

"A. No, sir.

"Q. Do you think that if you had formed a conclusion after the guilt or innocence stage, and I believe you stated that as you sit there now that you can't think of a case where a life sentence would be proper in a capital murder case; is that correct, sir?

"A. Right.

"MR. BORG: I'll object to the form of the question, that he can't think of a case. Once again, Counsel's question—the man said he could be open-minded and consider both a life and a death. Counsel has just established the man, at this moment, just can't think of a set of facts. That in no way means that he can't be open-minded and consider it. Counsel's question was phrased, 'since you can't think of any.'

"THE COURT: I"ll sustain the objection.

"BY MR. ROE:

"Q. Well, taking into consideration what you have already told us here—

"MR. ADCOCK: Same objection.

"THE COURT: Sustained.

"MR. ROE: Your Honor, I've already asked that question once, and they sat

there in their chair. This man has already answered it, and I think I can use that in forming another question.

"THE COURT: I sustained it.

"MR. ROE: Note our exception.

"BY MR. ROE:

"Q. Once again, knowing what you have already stated in Court, and knowing that you have already stated that you cannot think of a set of facts where you would feel justified in a life sentence, do you feel—

"MR. ADCOCK: Your Honor, I'm going to object to that. The gentleman did not say that.

"THE COURT: I sustain the objection.

"BY MR. ROE:

"Q. Could I ask you if you stated that or not?

"MR. ADCOCK: Your Honor, I have had a ruling on that, and now he's trying to argue with the Court.

"THE COURT: Go back to the witness room. I'll get you when we're ready.

[At this time, Juror McClellan was excused from the Courtroom, and the following proceedings were held outside his presence:]

"THE COURT: Now, Counsel, if this Court understands the law, you can't ask this juror to dream up an example for you about a life sentence. That is directly in the face of the statute itself that says that you are to ask him if he could follow the law in answering those questions, without any regard to the results. And, he has answered at least three or four times into this record that he could, and I have sustained the objections two or three times on that question, and I don't want you to ask it in that fashion again.

"MR. ROE: Okay. Well, of course, we're not after just challenges for cause. We are asking—we are looking for questions or answers to questions, to intelligently be able to use our peremptory challenges, also. For that reason, that is why I'm getting into this, and I believe the juror already

testified, or stated, that he could not think of one set of facts where he would feel justified in giving a life sentence.

"THE COURT: The tenor of his answer is that he couldn't think of one right now.

"MR. ROE: Exactly.

"THE COURT: But that, in this Court's opinion, is not a legal question for you to ask anyway, and I don't think that you have any right to ask this juror to give you an example of what he would give a life sentence on. That is my ruling.

"MR. ROE: That's why I just asked him if he could think of one set of circumstances—well, Your Honor, I'm not sure I follow the Court's ruling as to what questions I can and can't ask him.

"THE COURT: I'm not going to tell you what questions you can and can't ask. I'm simply telling you that I have ruled three times on the question that you are now attempting to ask, and I have sustained the State's objections.

All right. Call the juror back.

[At this time, Juror McClellan was again seated in the witness chair, and the following proceedings were held:]

"THE COURT: All right, Counsel, go ahead.

"MR. ROE: Your Honor, based on the Court's ruling, we will pass the juror."

Thereafter, the defense challenged McClellan for cause based upon his answers to the questions concerning whether he could possibly think of a set of circumstances where he could vote for a life sentence. The court overruled the challenge and appellant exercised a peremptory strike.

Our review of the pertinent part of the voir dire which we have set out above shows that McClellan never indicated that he would automatically vote for the death penalty. Rather, McClellan clearly stated that he would consider both the death and life imprisonment and his vote would de-

pend upon the particular facts adduced at trial.

■ As to his contention regarding the court's disallowance of his questions, we find that his questions were not proper ones. The law does not permit the exclusion of a prospective juror because he or she cannot think of a set of facts where it would be proper to give a life sentence in a capital murder case. Rather, Article 35.-16(c)(2), V.A.C.C.P., provides that a juror may be challenged for cause by the defense if "he has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely...." The questions disallowed by the court were not pertinent to this inquiry. The inability to articulate a set of facts where a life sentence was the proper punishment does not show an inability to consider the full range of punishment. Moreover, the juror had already clearly stated that he could consider both the death penalty *and* life imprisonment. The trial court did not err in overruling appellant's challenge for cause nor did the court abuse its discretion in limiting the defense's voir dire examination of McClellan.

■ In his next two grounds of error appellant argues that the trial court erred in refusing to grant him an additional peremptory challenge and he was compelled to accept juror John Dupuy. Furthermore, he argues that the trial court erred in predicating the granting of an additional peremptory challenge to appellant only if a subsequent prospective juror was "inherently unfair to the defense."

The record reflects that appellant exercised his last peremptory challenge on Jimmy McClellan. Immediately thereafter, the appellant requested an additional peremptory challenge. The court answered:

"THE COURT: I'll carry that request in abeyance. I won't rule on it now, but I'll let you know if I'm going to allow it.

"* * *

"THE COURT: * * *

I'm not overruling your motion for an extra strike. I might very well—if I see somebody that the Court thinks is inherently unfair to the Defense—at any rate, I'll rule on it, if the Court deems it necessary to rule on it, as we go along. I'm carrying it in abeyance at this time. The Court, in doing that, will state into the record that in the Court's opinion, I have actually given both sides two or three extra strikes in this Court's ruling a time or two during this trial, where both sides did not always have a legal challenge, and I have ruled in the Court's opinion, in giving them extra strikes—unofficial strikes.

"MR. BORG: May we approach the bench very quickly.

[Brief hearing at the bench]

"THE COURT: All right. I'll straighten up this record by saying that, a time or two on the Defense side, I gave you the benefit of the doubt when I didn't think there was a legal challenge for cause. I have not done that, in my opinion, in the State's side at all, so that I feel like you have had a couple of extra strikes. The Court is aware that that's not official strikes, but nevertheless, I still carry your motion in abeyance.

Call the next juror.

"MR. BORG: Thank you, Your Honor."

The record reflects that the next juror, Alva Blue, was struck by the State. After both sides had examined the next juror, John Dupuy, the appellant again requested an additional peremptory challenge. When the court asked the defense if they wished to challenge the juror, defense counsel replied that they had not yet decided if they would challenge the juror, but they did desire the court to rule on their request for an additional challenge. The court then ruled that since there was nothing in Dupuy's answers that would indicate unfairness to either side, the appellant's motion for an extra strike would be overruled. The defense informed the court that he would have used a peremptory strike on

Dupuy because of his employment with the federal government.

We not initially that, since we have found the trial court did not err in denying appellant's challenges for cause to prospective jurors McClellan and Harding, appellant was not entitled to an additional peremptory challenge. Therefore, the trial court did not err in refusing to grant an additional challenge. *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr.App.1980); *Von Byrd v. State*, 569 S.W.2d 883 (Tex.Cr.App.1978).

Appellant has cited no authority in support of his contention that the standard enunciated by the trial court in determining the necessity of additional peremptory challenges was contrary to law. Clearly, the granting of additional peremptory challenges is up to the discretion of the trial judge. We find no abuse of discretion in the instant case, especially where appellant's challenges for cause were properly overruled.

The remaining grounds of error deal with the punishment phase of the trial.

▄▄ Dr. James Grigson was called by the State to testify at the punishment stage of the trial. Dr. Grigson had not examined appellant but answered in response to the prosecutor's hypothetical question that appellant would commit future acts of violence and would be a continuing threat to society. Appellant argues in two grounds of error that because the hypothetical question was based solely on the facts in evidence and was not based on any medical or psychiatric evidence Grigson's answer was merely a legal conclusion which invaded the province of the jury and bolstered the State's evidence.

First, we note that appellant's objection at trial to Grigson's testimony does not totally comport with the argument he now raises on appeal. Appellant objected at trial that (1) no predicate had been laid to demonstrate that Grigson was capable of answering the hypothetical question, (2) allowing Grigson to answer the question would invade the province of the jury, (3) Grigson was going beyond his expertise in predicting future criminal acts of violence,

and (4) the hypothetical question assumed facts not in evidence. Because appellant's objection at trial varied from the ground he now urges on appeal, we are not mandated to consider his argument. *Carrillo v. State*, 591 S.W.2d 876 (Tex.Cr.App.1979); *Crocker v. State*, 573 S.W.2d 190 (Tex.Cr. App.1978). Nevertheless, we will address the merits of appellant's complaint.

In *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr.App.1980), Drs. John Holbrook and James Grigson were given a hypothetical fact situation based on the evidence introduced at trial and both testified that an individual described in the question would constitute a continuing threat to society. On appeal, this Court wrote:

"This Court is well aware that the ability of psychiatrists to predict future behavior is the subject of widespread debate. However, we are not inclined to alter our previously stated view that a trial court may admit for whatever value it may have to a jury psychiatric testimony concerning the defendant's future behavior at the punishment stage of a capital murder trial. *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr.App.1978); *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976).

"The trial court did not err by permitting the doctors to testify on the basis of the hypothetical question. The use of hypothetical questions in the examination of expert witnesses is a well established practice. 2 C. McCormick and R. Ray, Texas Evidence, Sec. 1402 (2d ed. 1956). That the experts had not examined appellant went to the weight of their testimony, not to its admissibility.

" * * *

"Appellant also contends that Holbrook and Grigson should not have been permitted to express an opinion as to the probability of future violent behavior on his part because such testimony constitutes a legal conclusion.... Appellant argues that a witness should not be permitted to testify that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society be-

cause the question involves a legal definition and a legal test.

"Appellant's contention is without merit for the simple reason that 'probability,' 'criminal acts of violence,' and 'continuing threat to society' are not terms defined by statute or case law. On the contrary, they are words of ordinary meaning. *King v. State,* supra. [553 S.W.2d 105 (Tex.Cr.App.1977)]. Thus, the testimony in question did not involve the application of a legal definition or test. We also note that if appellant were correct in arguing that a witness may not express an opinion on a matter involving a legal definition or test, this would, among other things, prevent the routine practice of asking a psychiatrist whether, in his opinion, the defendant was legally insane at the time of the offense. V.T.C.A., Penal Code, Section 8.01." 596 S.W.2d at 887–888. (material in brackets added.)

The United State's Supreme Court agreed with our holding in *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). Justice White, in writing for the majority, pointed out that although highly damaging to the appellant the psychiatric testimony could have been countered either by bringing in the defense's own psychiatrists who could have testified as to their own opinion or rebutted the ability of the State's experts to make such a determination, or the defense counsel could have posed his own hypothetical question to the State's experts based on his own version of the facts and including whatever mitigating factors he deemed applicable. Neither of these tactics was used in the instant case.

"... There is no doubt that the psychiatric testimony increased the likelihood that petitioner would be sentenced to death, but this fact does not make that evidence inadmissible, anymore than it would with respect to other relevant evidence against any defendant in a criminal case." 103 S.Ct. at 3400.

We find no error. See also: *Nethery v. State,* 692 S.W.2d 686 (Tex.Cr.App.1985);

*Vanderbilt v. State,* 629 S.W.2d 709, 720–21 (Tex.Cr.App.1981); *Smith v. State,* 683 S.W.2d 393 (Tex.Cr.App.1984).

This ground of error is overruled.

██ Appellant argues that he was denied due process and equal protection of the law when, during the punishment phase of his trial, the State was allowed to introduce evidence regarding an extraneous rape charge, even though the trial of that charge resulted in a hung jury and the charge was thereafter dismissed because the complainant refused to testify against him. Appellant argues that since in non-capital cases evidence of a defendant's prior criminal record is limited to a final conviction or to cases in which the defendant receives a probated or suspended sentence, Article 37.07, Section 3(a), V.A.C.C.P., the same rule should apply in capital cases. He further argues that by allowing the admission into evidence of unadjudicated charges pursuant to Article 37.07(1)(a), V.A.C.C.P., the presumption of innocence is abandoned and the burden of proof is placed upon the defendant to rebut the allegations of these unadjudicated criminal charges, in addition to defending the capital murder case for which he stands accused.

This argument was considered and rejected in *Williams v. State,* 622 S.W.2d 116 (Tex.Cr.App.1981), wherein this Court held that absent a showing of unfair surprise, proof of an unadjudicated, extraneous offense at the sentencing stage of a trial on a capital case is admissible and does not deny a defendant due process and equal protection under the law. See also, *Morin v. State,* 682 S.W.2d 265 (Tex.Cr.App.1983). Appellant has made no showing of unfair surprise. There is no error.

Having found no reversible error, we affirm appellant's conviction.

CLINTON and TEAGUE, JJ., concur in result.