

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,018

**PAUL DAVID STOREY, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 1042204D
### IN CRIMINAL DISTRICT COURT THREE
### TARRANT COUNTY

**MEYERS, J., delivered the opinion of the unanimous Court.**

### O P I N I O N

Appellant was convicted in September 2008 of capital murder. TEX. PENAL CODE

ANN. § 19.03(a)(2). Based on the jury's answers to the special issues set forth in the

Texas Code of Criminal Procedure, Article 37.071, sections 2(b) and 2(e), the trial judge

sentenced appellant to death. Art. 37.071, § 2(g).[1] Direct appeal to this Court is

automatic. Art. 37.071, § 2(h). After reviewing appellant's sixteen points of error, we

find them to be without merit. Consequently, we affirm the trial court's judgment and

sentence of death.

## STATEMENT OF FACTS

Appellant does not challenge the sufficiency of the evidence, but a brief statement

of the facts is helpful for an understanding of appellant's claims. Appellant was charged

with intentionally causing the death of Jonas Cherry while in the course of committing or

attempting to commit robbery. The record reflects that around 8:15 a.m. on October 16,

2006, Cherry left his house and went to work at the Putt-Putt Golf and Games in Hurst,

Texas ("the Putt-Putt"). When Cherry arrived for work, he passed through the east door,

which was the employees' entrance, and at 8:43 a.m., he disarmed the security alarm

system. When a co-worker, Timothy Flow, arrived about ten minutes later, he found

Cherry lying in a pool of blood in the office area. Flow noticed that Cherry was holding a

key to the door of the manager's office, which was locked. Concerned that the

perpetrator might still be present, Flow retreated outside. Once he saw that only his and

Cherry's cars were in the parking lot, he went back inside to check on Cherry. Based on

his observations, he believed that Cherry was dead. Flow then walked back outside while

---

[1] Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

calling 9-1-1 on his cell phone, and he waited in his truck until the police arrived. Officer Samantha Wilburn and Corporal Lonnie Brazell responded first. After speaking with Flow and observing Cherry's body, they called for the assistance of additional officers.

With the help of the manager, Patrick Arenare, police officers gained entry to the manager's office, where the business's surveillance equipment was kept. Four separate videocassette recorders ("VCRs") should have been set up for surveillance. However, one VCR had been stolen, and videotapes had been stolen from two other VCRs. The fourth VCR still contained a surveillance videotape and was functioning. It was connected to a video camera that monitored a section of the business's driveway that led from the road and into the parking areas. When officers played the videotape, they observed a red two-door Ford Explorer with its hood up and its lights flashing, rolling from the direction of the road into the public parking area, and then moving out of view as it continued through the parking lot. A few minutes later, the Explorer came back into view, and then it passed out of view again as it rolled toward the employees' parking area. This videotape was released to the media and aired on the local news.

One of appellant's friends reported that appellant had told her he was present during the offense and saw who committed it. She provided the police with appellant's telephone number. Detective Rick Shelby, a Hurst police officer, contacted appellant by telephone. Appellant acknowledged that he was a former employee of the Putt-Putt, and

he admitted that the Explorer that was being shown on the news was his.[2]  He stated that he was willing to meet with Shelby at the police station but that he did not have transportation because his Explorer was not working.  He accepted Shelby's offer of a ride and provided Shelby with directions to his house.  Shelby and Sergeant Craig Teague then drove to appellant's house, where they met appellant, appellant's brother, and a friend.  Appellant and his brother showed them the Explorer.  Appellant explained that the license plates on the Explorer did not match the ones in the video that was being shown on the news because he had switched the plates in order to do a "gas run."[3]  Appellant then accompanied Shelby and Teague to the police station to make a statement.

Over the next few days, appellant made three oral statements to police.  In his first statement, he denied participating in any offense but admitted that he was a witness.  In his second statement, he admitted to participating in the offense, but only as a lookout and by helping others gain entry to the Putt-Putt and by warning them to collect the surveillance tapes.  In his third statement, he admitted that he had planned and participated in the robbery and that he had shot Cherry.

All three of appellant's statements were presented to the jury.  The medical examiner testified that Cherry suffered two gunshots to his head.  One shot entered from

[2]  The record reflects that the Explorer was owned by appellant's mother, but appellant drove it regularly.

[3]  Appellant explained that this was his term for pumping gas into a vehicle and then driving away without paying.

the back, where there was a contact wound. Another shot entered from the front, where the entry wound indicated a shot fired at close range. Either shot would have been fatal. Cherry also suffered additional gunshot wounds to both legs and one hand.

APPELLANT'S STATEMENTS TO POLICE

In his eighth point of error, appellant alleges that the trial court erred when it overruled appellant's motions to suppress his statements to police because these statements were involuntary.[4] In his ninth and tenth points of error, he asserts that this error violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, section 9, of the Texas Constitution.[5] In his eleventh point of error, appellant further complains that his statements to police were taken in violation of Article 38.22, section 3, of the Texas Code of Criminal Procedure.[6]

---

[4] In the body of his argument in support of his eighth point of error, appellant also asserts that evidence was seized during the search of his vehicle and residence in violation of the Fifth and Fourteenth Amendments to the United States Constitution, Article I, section 9, of the Texas Constitution, and Articles 1.04, 1.06, 38.22, and 38.23, of the Code of Criminal Procedure. Appellant mentions that he filed pre-trial motions to suppress this evidence based on the absence of valid consent and the absence of a valid search warrant. However, he does not assert or argue that the trial court erred by denying these motions. Nor does he allege any facts or cite any legal authority in support of these claims. To the extent that he intends to challenge the seized evidence, his point of error is inadequately briefed. It is also multifarious. *See* TEX. R. APP. P. 38.1; *Cardenas v. State,* 30 S.W.3d 384, 393 (Tex. Crim. App. 2000). We decline to address this portion of appellant's eighth point of error.

[5] Because appellant does not argue that the Texas Constitution provides or should provide greater or different protection than the federal constitution, his tenth point of error is inadequately briefed and will not be addressed. *See Murphy v. State,* 112 S.W.3d 592, 596 (Tex. Crim. App. 2003).

[6] Appellant's brief cites to Article 38.22, section 2, which governs the admissibility of

(continued...)

Appellant asserts that his statements were involuntary because they were the result of duress, coercion, and improper promises. Specifically, he alleges that the fact that he was interviewed multiple times in a small interrogation room, in the presence of multiple officers, constituted duress and coercion. He also asserts that Shelby, the police officer who conducted the interviews, made improper promises that induced appellant's statements.[7]

Appellant did not allege in his motions to suppress or at the suppression hearing that his statements were taken under duress or coercion due to being interviewed multiple times in a small interrogation room in the presence of multiple officers. We decline to address this portion of his argument because it does not comport with his argument at

---

[6](...continued)
written statements. The record in this case does not reflect that any written statements were admitted into evidence; rather, recordings of appellant's oral statements were admitted. The admissibility of oral statements is governed by Article 38.22, section 3. We presume that appellant intends to rely on Section 3.

Appellant also alleges that his statements were taken in violation of Article 1.05 and Article 38.23. However, except for his previous point of error alleging that his statements were involuntary, appellant does not describe how the taking of his statements violated these articles. Therefore, any additional grounds of error implicating Article 1.05 and Article 38.23 are inadequately briefed. *See* TEX. R. APP. P. 38.1.

[7] Within this argument, appellant further asserts that his arrest was illegal because the arrest warrant was not proper and not based on probable cause, and so his third statement, which was taken after his arrest, was the result of an illegal arrest and the fruit of the poisonous tree, in violation of the Fourth Amendment of the United States Constitution and Article I, section 9, of the Texas Constitution. Appellant does not describe the contents of the arrest warrant or allege any facts in support of his conclusory assertions. Therefore this complaint is inadequately briefed. It is also multifarious. *See* TEX. R. APP. P. 38.1. We decline to develop appellant's argument for him. *See Cardenas,* 30 S.W.3d at 393.

trial. *See* TEX. R. APP. P. 33.1. However, appellant did argue at the suppression hearing that his statements were the result of improper promises.

A trial court's ruling at a suppression hearing is reviewed for an abuse of discretion. *Rocha v. State,* 16 S.W.3d 1, 12 (Tex. Crim. App. 2000); *see also Ramos v. State,* 245 S.W.3d 410, 418 (Tex. Crim. App. 2008). An appellate court must view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly,* 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We afford almost total deference to a trial court's determination of historical facts. *Montanez v. State,* 195 S.W.3d 101, 109 (Tex. Crim. App. 2006). We do not engage in our own factual review; we determine only whether the record supports the trial court's finding. *Rocha,* 16 S.W.3d at 12. The trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Ramos,* 245 S.W.3d at 418.

The voluntariness of a confession is assessed by looking at the totality of the circumstances. *Barefield v. State,* 784 S.W.2d 38, 40-41 (Tex. Crim. App. 1989). A statement is involuntary, within the meaning of the federal due process clause, only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker. *Alvarado v. State,* 912 S.W.2d 199, 211-12 (Tex. Crim. App. 1995).

Article 38.21 sets forth the terms under which both custodial and non-custodial statements may be admitted at trial. *See Oursbourn v. State,* 259 S.W.3d 159, 172 (Tex.

Crim. App. 2008); *State v. Terrazas,* 4 S.W.3d 720, 724 & n.2 (Tex. Crim. App. 1999). It provides that a statement of an accused may be used as evidence against him if it appears that the statement was freely and voluntarily made without compulsion or persuasion. Art. 38.21. Article 38.22, section 6, sets out the procedures for litigating voluntariness claims in all cases where a question is raised as to the voluntariness of a statement of an accused. *Terrazas,* 4 S.W.3d at 724. A defendant claiming that his confession is involuntary has the burden of presenting evidence that raises a voluntariness question. *Id.* at 725-28.

An inculpatory statement is inadmissible as having been induced by an improper promise if (1) the statement was obtained as a result of the positive promise of a benefit to the defendant, (2) the promise was made or sanctioned by one in authority, and (3) the promise was of such a character as would be likely to influence a defendant to speak untruthfully. *Martinez v. State,* 127 S.W.3d 792, 794 (Tex. Crim. App. 2004); *Hardesty v. State,* 667 S.W.2d 130, 134 (Tex. Crim. App. 1984). The reviewing court looks to whether the circumstances of the promise would have made the defendant inclined to admit to a crime he did not commit. *Sossamon v. State,* 816 S.W.2d 340, 345 (Tex. Crim. App. 1991).

Here, the record shows that all three interviews were conducted by Shelby and one other police officer in an interrogation room at the Hurst Police Department. The first interview took place on the evening of October 19, 2006. The second interview took

place on the afternoon of October 20. Later that day, an arrest warrant was prepared and appellant was taken into custody. On the evening of October 21, appellant was interviewed a third time.

Shelby's testimony at the suppression hearing revealed that appellant's first statement was taken after Shelby contacted appellant by telephone and asked him if he would be willing to go to the police station to give a statement. Shelby testified that this first interview started around 8:00 p.m. and lasted about one and one-half hours. Shelby testified, and the audiovisual recording of the interview reflects,[8] that at the beginning of the interview, Shelby advised appellant that he was not in custody and that he could stop talking and ask Shelby to take him home at any time. Shelby then read appellant his rights, pausing to explain that appellant had the right to ask for a lawyer before and during questioning and to remind appellant again that he had the right to stop talking at any time. He advised appellant that the "room [was] being recorded." Appellant signed the card to indicate that he had been advised of his rights and waived them.

Shelby then asked appellant to describe what had happened. Appellant related that he had pulled into the Putt-Putt parking lot because he was having car trouble. His friend, Mark Porter, was with him. While Porter waited in the Explorer, appellant walked to the building's entrance to find help, but while he was standing outside the door, he heard a

_____

[8] State's Exhibits 2, 4, and 6 are unredacted audiovisual recordings of the three interviews that the judge reviewed in making her decisions on appellant's motions to suppress his statements.

single popping sound, followed by a quick succession of more popping sounds, that he believed to be gun shots coming from inside the building. As he ran back to the Explorer and began to drive away, appellant saw a black man with a gun and a bag walking out of the building toward a parked Hyundai Sonata where two other black men were waiting.

At the end of the interview, the officers told appellant that his failure to come forward with this information led them to suspect that he was involved in the offense. They asked appellant why he had not contacted the police to tell them what he had observed. Appellant stated that he had not wanted to get involved in the case. He insisted that he was telling the truth. The officers asked appellant if he would be willing to help them eliminate him as a suspect by taking a polygraph examination, reporting the license plate number of the Sonata if he saw it again, and helping the police contact Porter. Appellant agreed to do all of these things.

Shelby testified at the suppression hearing that after the first interview, appellant directed Shelby and Teague to the house where Porter was staying. Appellant got out of the police car to speak with a couple who were in a car that was backing out of the driveway, but he soon returned and told the officers that Porter was not there. The officers then took appellant home. Appellant and Shelby confirmed that Shelby would pick appellant up the next day so that he could take a polygraph exam.

The next day, Shelby told appellant that he had not yet scheduled the polygraph exam. Appellant advised Shelby that Porter wanted to talk to him, and he accompanied

Shelby in the police car to a bus station to look for Porter. When they could not find him, Shelby drove appellant home. While they were sitting in the car outside his house, Shelby asked appellant if he wanted to talk about something. Appellant said that he did. He agreed to go with Shelby to the police station to give a second statement.

The audiovisual recording reveals that this second interview, conducted by Shelby and Teague, started around 2:20 p.m. and lasted a little less than two hours. At the beginning of the interview, Shelby again advised appellant of his rights and had him sign an acknowledgment of his rights. He again asked appellant if he wanted to tell him something, and appellant advised Shelby that he might know the gunman. Appellant then described how a man named "Carlos" had promised to give him and Porter some shoes to sell if they would meet Carlos at the Putt-Putt where he planned to take delivery of the shoes. Appellant claimed that while he and Porter were waiting in the Explorer in the parking lot, Carlos and two other men committed a robbery-murder inside the Putt-Putt. Shelby told appellant that he did not believe appellant had told them everything. He urged appellant to tell the truth in order to help himself. Shelby told appellant that he would "go down for capital murder if [he was] not entirely truthful on this thing." He told appellant that it looked bad for him to keep coming in and lying on the videotape. Shelby said a district attorney would be more likely to bring a capital murder case against appellant if he kept changing his story.

Appellant then asserted that he and Porter had acted as lookouts for Carlos and two other men after Carlos told them that he was going to rob the Putt-Putt because the person who was supposed to give him the shoes had failed to deliver them. Appellant asserted that he and Porter never left the Explorer and that he did not know that anyone had been killed until later, when Carlos told him over the phone that he had shot a Putt-Putt employee in the back of the head and that another guy had also shot the employee. Appellant then admitted that he left the Explorer to ring the doorbell while Carlos and the others went inside, but he still maintained that he returned to the Explorer and waited there with Porter.

Reminding appellant that in his first statement he had vividly described hearing gun shots inside the building, Shelby and Teague expressed disbelief that appellant never left the Explorer during the offense because he would not have been able to hear the shots from his vehicle. Appellant then explained that after Carlos and two other men entered the building, he left his vehicle and walked to the building entrance, where he waited outside until he heard gun shots. The officers continued to express the opinion that appellant was not being completely honest. Shelby said, "Uh, we're trying to help you man, but you're, you're about to take a fall for capital murder, unless you can tell us the truth." He added, "I can't guarantee you one way or the other what's going to happen but, I can promise you that people look at honest people who make a mistake differently than they [look at] somebody who's squirreling around, lying their head off."

Appellant then retracted his story about waiting outside the building's entrance and again asserted that he stayed in the Explorer and did not know about the shooting until Carlos told him about it later. Appellant stated that he had not received any money from the robbery. However, after the officers revealed that they knew he had been spending money the day after the robbery, appellant admitted that he had received a share of the money. He said that Carlos came by his house with some money, and while he was there, Carlos described what had happened inside the Putt-Putt.

The officers again expressed skepticism that appellant never left his Explorer during the offense. Appellant then changed his story again and related how he had walked to the building's entrance while Carlos and two other men were inside with the employee. He stated that one of the men had propped the door open, so he stuck his head inside to see what they were doing. He heard them talking loudly to the employee, and he called to them to hurry up. Appellant said that he saw one of the men holding the employee by the back of his shirt and poking him in the back of his neck with a gun.

The officers pointed out that appellant would not have been able to see these events from the building's entrance. Appellant then asserted that he had walked into the building far enough to see what was happening. In this version of events, appellant saw Carlos coming out of the manager's office, and then he saw Carlos and another man start to walk away from the employee. Then, he saw them turn around and shoot the

employee. Appellant ran out of the building and got back into the Explorer, where he waited for Carlos and the other men to come out.

The officers told appellant that he had provided a lot of helpful information. But Shelby added, "I think it's only really helpful if a judge or a jury, or a district attorney who's trying to make a deal with you on this, knows that you've been entirely truthful." He expressed the view that appellant had gone further into the building than he had admitted. Shelby explained that some of what appellant told them still did not "add up to" the physical evidence the police had found. He said that he wanted to believe appellant.

Appellant then modified his story again. He stated that before the robbery, he told Carlos to get the videotapes from the office, and he entered the building during the robbery to make sure that Carlos got the tapes. Appellant stated that after the robbery, while they were walking to their cars, he asked Carlos whether he had gotten the tapes, and Carlos said that he had. Carlos later told appellant that he had taken the tapes apart and burned them.

Appellant then stated that he had hidden the license plates he had used during the robbery in some woods. Initially, he would not specify the place where he had hidden them. Shelby told him, "You, we're at the point now, where, you're toast on a capital murder." And then Shelby added, "What you're, what you're doing now is kind of seeing, you know, what, what's going to happen as a result of it. . . . Cause you've

admitted that you took part in a capital murder. So why are you fooling around with hiding license plates?" Appellant then described where he had thrown the license plates. Shelby assured him, "That helps your case if you say, 'They're over here,' and we go over there, and they're there." But Shelby also maintained that appellant's story still did not add up completely. He indicated that the police had evidence that appellant did not know about. Shelby said he would be sick if he had to tell appellant's mother that in addition to committing the offense, appellant lied about it "to the very end."

Appellant then admitted that he accompanied Carlos and two other men into the building, heard their conversation with the employee, saw them collect the money, and watched Carlos and another man shoot the employee. Appellant said that Carlos stood behind the employee and shot him in the head and the other man shot him after he fell to the ground. After additional questioning, appellant admitted that before they entered the building, he rang the door bell so that the employee would open the door for them. He also admitted that before the robbery, they had been waiting in the parking lot for the employee to arrive, and they watched him park his car and go into the building.

The officers and appellant then discussed Porter. Appellant stated that he believed Porter would want to cooperate with them so that he would not "face what the gunman is gonna face." Shelby discussed capital murder with appellant. Appellant acknowledged that the potential punishment was death and that he might face lethal injection. Shelby said, "I don't know what's gonna happen in your case." He added, "But I do know that

people have a hard time putting a guy who made a mistake, sending him down to death row.  A guy with a clean record like yours, provided he's honest and made a mistake. . . . [W]hat that requires of you, I think, is that you just be entirely truthful."  Shelby mentioned again that he wanted to be able to tell appellant's mother that appellant had been honest.  He then advised appellant that he was free to go and offered to give him a ride home.  He asked appellant to show him where the license plates were hidden and to help him find Porter, and appellant assented.

Shelby testified at the suppression hearing that while they were en route to search for the license plates, Shelby was called back to the police station.  Another officer then took appellant to find the license plates.  Appellant was arrested later that day.  His third interview began the next day, around 6:25 p.m., and lasted about one and one-half hours.

The audiovisual recording reflects that Shelby and Detective Billy Keadle conducted the third interview.  Shelby again read appellant his rights, advising him this time that he was in custody.  Shelby indicated that they had spoken with Porter.  He again urged appellant to be honest.  He told appellant that he knew Carlos was not involved and that it was just appellant and Porter.  Shelby admonished appellant that he needed to be honest for his own good.  He said that he and the other officers respected appellant but that it was hard to respect someone who was not honest.  Shelby said that a judge or jury would recognize that appellant was "not hard" and just made a mistake.  He anticipated that if appellant did not tell them what had happened, the "last image" everyone would

have of appellant would be the videotape of his second interview being played in court, with his mother and friends watching, and it would show him "lying like a schoolboy." Shelby admonished appellant that he would not "want to be remembered for telling some silly little story." He again encouraged appellant to be honest, telling him that he had a "huge conscience" and that his mother raised him to know right from wrong. Shelby told appellant that based on the evidence they had, appellant was "good [for] the offense" and so he might as well "do what's right."

Appellant voluntarily waived his right to remain silent, but at first he hesitated to talk about the offense. Shelby again confronted appellant with the fact that Porter had given a statement, and he exhorted appellant to be truthful because he was already "in up to [his] neck." Appellant remarked that he did not think it mattered whether he was honest because his life was already over. Part of this exchange was as follows:

STOREY:   I'm twenty-two years old.

SHELBY:   Mm hm.

STOREY:   And right now I'm looking death in its face.

SHELBY:   You're looking death in its face. Jonas'? Your own death? Let's think about Jonas' death. Can we think about somebody else for just a minute? Did he deserve to die over a few hundred dollars? He didn't, did he? And yet it, just a split-second decision with no thought, his life is gone. You're gonna have the rest of your life to live. You might do some prison time. You might not do any. I don't know. I do know that you need to do what's right, at this moment. You think about Jonas. A man just showing up for work like he did every day with his lunch in his hand. Just a regular guy, married. He didn't know what was about to happen to him

> that day but you knew what was gonna happen to him that day. When you're twenty-seven, you'll still be alive and kicking. Everything you've told us now looks poorly on you. Because you sat there and didn't tell the truth. It puts you there so you're good for the offense. So why not just do what's right from here on? Let's clear this thing up.

Shelby and Keadle both continued to encourage appellant to tell them the truth about what happened. They asked appellant whether he intended to kill anyone before he and Porter went into the Putt-Putt, or whether the killing was just an accident. They expressed the view that appellant just wanted to get some easy money. They asked appellant where Cherry was when they walked in. Appellant answered that Cherry had been standing in the door.

Appellant then admitted that he had confronted Cherry with a gun, made Cherry open the office, and collected the VCR and videotapes, while Porter made Cherry open the safe, fill a trash bag with money, and hand Porter the bag. Appellant asserted that Porter did most of the talking. He stated that Porter accidentally shot Cherry in the back of the head and then appellant fired at least four additional shots. Later, appellant and Porter unraveled the videotapes and burned them in a metal bucket. Appellant stated that he threw the VCR he had taken into the lake, along with his license plates, and that he and Porter sold the semi-automatic nine millimeter guns they had used. Appellant indicated that they split the money from the robbery "straight down the middle." Shelby then asked appellant, "What made you all decide to shoot Jonas?" Appellant stated that Porter accidentally fired the first shot and then appellant just "kind of got caught up in all of it."

Appellant later told a slightly different version of the story, in which he related that he did most of the talking, telling Porter what to do and ordering Cherry around. He again asserted that Porter shot Cherry first. The officers questioned this assertion based on the blood spatter evidence, but appellant continued to maintain that Porter fired the first shot. He stated that Cherry, from a kneeling position in front of the safe, said, "[P]lease, I gave you what you want," and "[D]on't hurt me," and then Porter said, "[S]hut up," and fired. Shelby said that did not sound like an accident. Appellant acknowledged that he did not know whether it was an accident.

The trial court watched the audiovisual recordings of appellant's statements and heard the evidence and arguments at the suppression hearing before making findings on the record. The trial court found that appellant was not in custody during the first two statements. The court found that appellant was in custody during the third statement, but the police complied with Article 38.22, and that appellant's statement was freely given after he knowingly, intelligently, and voluntarily waived his rights. The trial court found that although some of Shelby's comments "could easily be classified as bizarre, uncomfortable, or maybe inappropriate," they were not unlawful and they did not unlawfully induce appellant's statements. Accordingly, the court denied appellant's motions to suppress his statements.

Appellant does not challenge the trial court's finding that he was not in custody when he gave the first two statements. Appellant does not allege, and the record does not

show, that he did not voluntarily go with Shelby to the police station to give his first two statements or that he did not understand and believe Shelby's assurances that he could stop talking and ask to be taken home at any time. *See Chambers v. State,* 866 S.W.2d 9, 19 (Tex. Crim. App. 1993) ("[W]here the circumstances show that the person voluntarily accompanied the police in the investigation of a crime, and he knew or should have known that the police might suspect that he is implicated in the offense, whether he is acting upon the invitation, urging, or request of police officers, and not being forced, coerced or threatened, the act is voluntary and the person is not then in custody").

Concerning appellant's third statement, the trial court did not err when it found that the officers who interviewed appellant complied with Article 38.22. The record shows, and appellant acknowledges in his brief, that he received the required warnings and waived his rights at the beginning of the third interview.

Toward the end of the first interview, Shelby asked appellant to help with some additional investigation so that Shelby could eliminate appellant as a suspect. This was not an improper promise. Furthermore, it was made after appellant had given his first statement, and so it could not have influenced appellant's decision to give that statement. During the second interview, Shelby asserted that appellant's information would only be helpful if a judge or district attorney wanting to make a deal knew that appellant had been truthful. This assertion did not positively promise a benefit to appellant, nor was it likely to induce a false confession.

During appellant's third statement, Shelby told appellant that he would not want to lose the respect of his community and embarrass his mother, and that he needed to do what was right. These statements did not constitute improper promises likely to induce a false confession. Shelby's representations that appellant could help his case by being honest, that he might or might not do prison time, and that he would be less likely to be charged with capital murder or to receive the death penalty if he told police the whole story, may present a closer call. However, even assuming *arguendo* that such representations constituted positive promises made or sanctioned by one in authority, it is within the zone of reasonable disagreement to conclude that they were unlikely to induce a false confession. The trial court did not abuse its discretion in finding that Shelby's comments did not unlawfully induce appellant's statement.

Nothing in the record indicates that any of appellant's statements to police resulted from duress and coercion or were induced by improper promises. The record shows that appellant's statements were voluntary, were taken in compliance with Article 38.22, section 3, and did not violate appellant's federal constitutional rights. Therefore, the trial court did not abuse its discretion by overruling appellant's motions to suppress his statements to police. Points of error eight through eleven are overruled.

GENERAL VENIRE

In his first point of error, appellant complains that the trial court erred in denying his motion to quash the jury panel due to noncompliance with proper jury procedures

when, without a judge and outside of his presence, the prospective jurors submitted juror cards and were granted purported disqualifications and excuses. Appellant argues that the trial court's instruction to the jury bailiff to summon 150 additional prospective jurors for the general venire–an instruction that was given because the trial court intended to draw a capital jury panel from the general venire–effectively constituted a special venire as defined by Article 34.01. He reasons that, because this was a special venire, the court was required to comply with Article 35.03, section 1, which mandates that the trial court shall hear and determine excuses offered for not serving as a juror, including claims of exemption or lack of qualification. Appellant asserts that this provision was violated when the jury bailiff, as the court's designee, heard and determined such excuses. He points out that Section 2 expressly provides that a court's designee may hear and determine excuses in non-capital felony cases, and he reasons that the absence of similar language in Section 1 signifies that a court's designee may not hear and determine excuses in a capital felony case. *See* Art. 35.03 § 2. Appellant urges that he was harmed by the error because potential jurors were excused without proper verification, and the integrity of his jury was compromised.

We have rejected similar arguments in the past. *See Chambers,* 903 S.W.2d at 30; *Esquivel v. State,* 595 S.W.2d 516, 519-20 (Tex. Crim. App. 1980). When at least one hundred prospective jurors have been summoned for the week in which the capital case is set for trial, the decision whether to order a special venire is a matter within the trial

judge's discretion. *Esquivel,* 595 S.W.2d at 519-20. Nothing in the plain language of Article 35.03 prevents a judge from designating court personnel to make determinations with respect to venirepersons who have not yet been assigned to a capital case. *Chambers,* 903 S.W.2d at 30.

The record shows that at the time of trial, Tarrant County summoned hundreds of prospective jurors daily. The jury bailiff summoned people to jury duty and then decided exemptions and disqualifications in the general assembly before assigning jury panels to the requesting courts. Appellant's counsel was present while the jury bailiff decided these exemptions and disqualifications, and he did not complain of any errors during that process. Once a jury panel was assigned to the trial court presiding over appellant's case, the trial judge personally conducted the excusal process.

The jury bailiff acknowledged that she would call 400 people to a typical "Thursday panel," but that she called 900 people for this Thursday panel because she had notice from the trial court that it would be requesting 150 jurors for a capital trial. We decline to find that such a notice had the effect of imposing the procedural requirements of a special venire on the general assembly. *See, e.g., Chambers,* 903 S.W.2d at 29 (no abuse of discretion when general veniremembers who had gone through exemption and qualification process with court's designee were added to special venire during voir dire, after the trial court determined that the special venire did not provide enough prospective jurors); *Taylor v. State,* 420 S.W.2d 601, 604-05 (Tex. Crim. App. 1967) (contemplating

the summoning of additional veniremen "[i]n capital cases, upon the exhaustion of a special venire or the jury panel for the week").

In his second and third points of error, appellant alleges that designating the jury bailiff to decide exemptions and disqualifications violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and his rights under Article I, Section 14, of the Texas Constitution. Appellant's argument in support of these points consists of two sentences in which he (1) describes the general assembly as a "critical stage of the criminal proceeding" at which he and his attorneys were entitled to be present, and (2) declares that allowing a court's designee to hear and determine excuses violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the Texas Constitution. This argument is inadequately briefed and we decline to address it. *See* TEX. R. APP. P. 38.1; *Chambers,* 903 S.W.2d at 31 n.13 (rejecting, as inadequately briefed, appellant's largely unsupported claim of federal constitutional right to be present while trial court heard and ruled on excuses and disqualifications of venirepersons); *see also Murphy,* 112 S.W.3d at 596.

The trial court did not err in denying appellant's motion to quash the jury panel due to noncompliance with proper jury procedures or any constitutional violation. Points of error one through three are overruled.

LIMITATION ON QUESTIONING DURING VOIR DIRE

In his fourth and fifth points of error, appellant complains that the trial court abused its discretion when it sustained the State's objections to his questioning of prospective juror James Griffin concerning his understanding of "reasonable doubt." Appellant asserts that he was harmed because he "was forced to accept a juror without discovering his views on reasonable doubt and was denied a chance to develop a challenge for cause" with respect to Griffin, who was then seated as the twelfth juror. Appellant argues that, as a result, his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10, of the Texas Constitution were violated.

Part of the constitutional guarantee of the right to an impartial jury is an adequate voir dire to identify unqualified jurors. *Morgan v. Illinois,* 504 U.S. 719, 729 (1992). "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Id.* at 729-30. "The Sixth Amendment guarantee to trial by an impartial jury includes the right to have jurors that can follow the law and consider the evidence. In other words, the jury must be able to make an independent determination based on the facts presented at trial, not on any personal opinions they may have." *Raby v. State,* 970 S.W.2d 1, 10 (Tex. Crim. App. 1998). We have held that the protection of the Sixth Amendment extends to "the right to question veniremembers in order to

intelligently exercise peremptory challenges" as well as challenges for cause. *See, e.g., Franklin v. State,* 138 S.W.3d 351, 354 & n.15 (Tex. Crim. App. 2004).[9]

Article I, Section 10, of the Texas Constitution protects a defendant's "right of being heard," which includes the right to pose proper questions during jury voir dire. *See Jones v. State,* 223 S.W.3d 379, 381-82 & n.4 (Tex. Crim. App. 2007); *Franklin,* 138 S.W.3d at 357; *Gonzales v. State,* 994 S.W.2d 170, 171-72 (Tex. Crim. App. 1999); *but see Barajas v. State,* 93 S.W.3d 36, 42-45 (Tex. Crim. App. 2002) (Womack, J., concurring) (questioning whether the Texas constitutional right should include a right to ask questions that are not relevant to a challenge for cause). The defendant's right to question jurors in order to intelligently and effectively exercise peremptory challenges and challenges for cause must be harmonized with the right of the trial court to impose reasonable restrictions on the exercise of voir dire examination. *McCarter v. State,* 837 S.W.2d 117, 119-20 (Tex. Crim. App. 1992); *Ratliff v. State,* 690 S.W.2d 597, 599 (Tex. Crim. App. 1985); *see also Woolridge v. State,* 827 S.W.2d 900, 905 (Tex. Crim. App. 1992) (stating that in capital murder cases, trial judges have been allowed to limit individual voir dire when it appeared to be taking an unreasonable length of time). For instance, the trial court may curtail repetitive questioning. *Guerra v. State,* 771 S.W.2d

---

[9] The United States Supreme Court has held that peremptory challenges are not required by the United States Constitution, and so the fact that a proffered question would prompt "a revelation [that] would be of some use in exercising peremptory challenges" does not mean that such a question is compelled by the federal constitution, so long as the failure to ask it does not render the trial fundamentally unfair. *Mu'Min v. Virginia,* 500 U.S. 415, 425 (1991).

453, 467 (Tex. Crim. App. 1988); *Phillips v. State,* 701 S.W.2d 875, 889 (Tex. Crim.

App. 1985), *overruled on other grounds by Hernandez v. State,* 757 S.W.2d 744, 752

(Tex. Crim. App. 1988). Moreover, if a prospective juror states his position clearly,

unequivocally, and without reservation, the trial court does not err in refusing to permit

further questioning. *Phillips,* 701 S.W.2d at 889. Thus, not every restriction of an

otherwise proper question during voir dire constitutes an abuse of discretion. *See, e.g.,*

*Lagrone v. State,* 942 S.W.2d 602, 609 (Tex. Crim. App. 1997); *Wheatfall v. State,* 882

S.W.2d 829, 834-35 (Tex. Crim. App. 1994).

A prospective juror's understanding of reasonable doubt is a proper line of inquiry.

The plain language of Article 35, section 2, provides that the parties may question

prospective jurors on the principle of reasonable doubt:

> In a capital felony case, in which the State seeks the death penalty, the court
> shall propound to the entire panel of prospective jurors questions
> concerning the principles as applicable to the case on trial, of reasonable
> doubt, burden of proof, return of indictment by grand jury, presumption of
> innocence, and opinion. Then, on demand of the State or defendant, either
> is entitled to examine each juror on voir dire individually and apart from the
> entire panel, and may further question the juror on the principles
> propounded by the court.

Art. 35.17, § 2. Additionally, we have stated that a trial court abuses its discretion when

it refuses to allow the defendant to voir dire a prospective juror about what he thinks

reasonable doubt means. *See Goff v. State,* 931 S.W.2d 537, 550 (Tex. Crim. App. 1996)

(citing *Lane v. State,* 828 S.W.2d 764, 766 (Tex. Crim. App. 1992)); *Dinkins v. State,* 894

S.W.2d 330, 344-45 (Tex. Crim. App. 1995); *see also Rich v. State,* 160 S.W.3d 575, 576 (Tex. Crim. App. 2005).

Should a proffered question be erroneously denied during individual voir dire, the error is subject to a harm analysis. *See, e.g., Woods v. State,* 152 S.W.3d 105, 109 (Tex. Crim. App. 2004); *see also Gardner v. State,* 733 S.W.2d 195, 212 (Tex. Crim. App. 1987). We will disregard the error unless a substantial right has been affected. *Woods,* 152 S.W.3d at 109-10. We have found no harm in cases where the record reflects that counsel was able to ask the venireman a question that was essentially the same as the denied question, or to elicit the same information that the denied question sought to elicit. *See id.* at 110; *Rachal v. State,* 917 S.W.2d 799, 815 (Tex. Crim. App. 1996). Moreover, even if the denial of the question hampered the defendant's ability to intelligently exercise a peremptory challenge or to develop a challenge for cause, the defendant must show that, as a result, he was forced to accept an objectionable juror. *Cannady v. State,* 11 S.W.3d 205, 210 (Tex. Crim. App. 2000); *Narvaiz v. State,* 840 S.W.2d 415, 427 (Tex. Crim. App. 1992).[10]

---

[10] The erroneous prohibition of proper questioning of individual prospective jurors is subject to the harm analysis traditionally applied to the erroneous denial of a defendant's challenge for cause. For the erroneous denial of challenges for cause, a defendant is harmed only if (1) he exhausts all of his peremptory challenges, (2) he requests more challenges, (3) his request is denied, and (4) he identifies an objectionable person seated on the jury on whom he would have exercised a peremptory challenge. *Anson v. State,* 959 S.W.2d 203, 204 (Tex. Crim. App. 1997) (citing *Janecka v. State,* 937 S.W.2d 456, 470-71 & 471 n.9 (Tex. Crim. App. 1996)).

The record in this case reveals that prospective jurors were questioned about the principle of reasonable doubt during individual voir dire.  During the individual voir dire of Griffin, the prosecutor first discussed the meaning of reasonable doubt in the context of future dangerousness:

Q. Okay.  Do you think that I could convince you, I mean – and I'm not asking what specific facts, but do you think that I could – that you're the type of person that could be convinced that someone's a future threat to society?

A. I will answer it yes if that's based on the facts and the evidence that you present to me that overwhelms me in that regard, yes.

Q. Okay.  And let me – let me back up, because I've kind of skipped over this as to what beyond a reasonable doubt is.

Make no mistake, it is the highest legal standard in any courtroom in the United States.  It doesn't mean a hundred percent.  It doesn't mean beyond a shadow of a doubt.

How would you ever know something one hundred percent?  How would you personally ever know something one hundred percent?

A. I – I guess you couldn't know something one hundred percent, I guess.

Q. Okay.  Think about when your – how old are your children?

A. I have one daughter.  She's 27.

Q. Okay.  All right.  Think back to when she was little.  Okay?  How would you ever know a hundred percent she brushed her teeth?

A. Well, I mean, I would know by the evidence.

Q. Okay.

A. Which would be the used toothpaste, toothbrush, water in the sink.

Q. If you sat there and watched her do it?

A. Or watched her.

Q. Okay.  Do you think that that would be what would convince you a hundred percent?

A. True, yes.

Q. Okay. That would make you a witness to it. All right? You can't be a witness and be a juror, so the law doesn't impose that one hundred percent standard on us.

We could never prove anything a hundred percent because, obviously, we can't put even one juror [sic], let alone 12 eyewitnesses, on a jury. Okay?

A. Okay.

Q. So do you see how it's not a hundred percent?

A. Right.

Q. It's not beyond all possible doubt. But I don't want to minimize it because it is the highest standard. Okay?

A. Agree.

Q. All right. So do you feel like, looking at the evidence, that I could convince you, depending on the facts, that there are facts that could convince you that a Defendant is a future threat to society?

A. Yes. If the evidence that you present makes the case, yes.

Q. Okay. And if you did not believe that somebody was a future threat to society, your answer would be no to this question?

A. That is correct.

Q. And he would get a life sentence without parole. Okay?

A. Correct.

Q. All right. If you answer this question yes, then you move on to the second question.

And this is where we talked about the difference between should have anticipated and actually anticipated. Okay? Because you look at this question and it begins the same way, do you find beyond a reasonable doubt. Okay? Because that tells you [the prosecutor] has a responsibility. I have a job to do to prove to you that this answer must be yes. Okay?

A. Okay.

Later, defense counsel discussed the State's burden to prove all the elements of the offense beyond a reasonable doubt:

Q. Beyond a reasonable doubt is not legally defined. And it's kind of interesting because if – if we go to the Court in a civil suit, if you sue me for backing into your car in the parking lot and sue me for damages, whoever has – whoever proves their case by a preponderance of the evidence in a civil court is going to win.

And preponderance of the evidence is the standard of proof that is applied to making that decision by the jury, and it's legally defined. It's the greater weight and degree of the credible evidence.

And we sometimes illustrate it with a set of scales. Whichever side can tip the scales one way or another, they're entitled to a verdict. Anything over 50 percent of the evidence, I win.

See how that works?

A. Yes, sir.

Q. Okay. Beyond a reasonable doubt, while it's not defined, it is more than that. All right?

If the State comes in to try to terminate my parental rights of my seven-year-old son on the basis that I'm an unfit parent, the State has to prove that I am unfit by clear and convincing evidence. Okay? And that's legally defined.

And it means evidence of such a nature that would be sufficient to establish in the juror's mind a firm conviction or belief as to – as to the truth of the allegation that I'm unfit. Okay?

A. Okay.

Q. Proof beyond a reasonable doubt is more than that. Okay?

It says proof beyond a reasonable doubt. And – and I guess when – you know, the law says that that's not proof beyond all doubt because we presume there may be some doubts that are not based in reason. All right?

A. Okay.

Q. But any doubt, any reasonable doubt, is sufficient to return a verdict of not guilty. It's the highest burden recognized in the law.

You see – do you have some feel for what we're looking at in that regard?

A. Yes, sir.

Q. Okay. It's – and it's even more difficult because it's an individual standard. We don't tell the jury, go back there and come up with a definition for the group as to what beyond a reasonable doubt means. Okay?

A. Okay.

Q. It's that degree of satisfaction or confidence that you have to have acting as a juror that the evidence tells you you're doing the right thing, so to speak.

And if you don't have that confidence, if you don't have that degree of satisfaction, basically, that that's the right answer, if you've got some reasonable doubt based on the evidence, then you're – you find him not guilty. Okay?

A. Okay.

Q. Do you have any questions about that?

Do you feel like you have some understanding about what we're looking for or what we're talking about when we say proof beyond a reasonable doubt?

A. Yes, sir, I do understand that concept and I – I believe I can – based on the evidence and the facts, I can make a determination.

Q. Okay. Do you have some thought as to what it might personally mean to you? I mean, in light of all the – what we've discussed, as to what that standard might personally mean to [you]?

MS. JACK: I'm going to object. That calls for a commitment question.

THE COURT: Calls for a what?

MS. JACK: Commitment answer.

THE COURT: I'm sorry. I couldn't hear you.

MS. JACK: Commitment answer, Judge, as to what his personal definition of reasonable doubt is.

THE COURT: Okay. I'll sustain the objection to the question.

Q. (By Mr. Moore) Well, let me just ask you, what is your definition of beyond a reasonable doubt?

MS. JACK: Same objection, Judge.

THE COURT: I'll – I'm going to sustain the objection to the question.

MR. MOORE: Okay.

Q. (By Mr. Moore) Well, let me go on.

Whatever it means to you is the burden that you – you got to prove. Okay?

And they got to prove every element. Earlier Ms. Jack was talking to you about, you know, some elements – they got to prove it all, not – not just some.

And some jurors have problems with looking at the elements of the offense. You know, it's a pretty easy decision if the question is did they get the right weapon, did they do it – you know, they pled that he hit him in the head with a brick and the evidence shows that they pushed him over the edge of a cliff.

You see what I mean?

A. I do.

Q. And the law says that the jury, if they have a doubt on any of the evidence, whether it's by mistake on their part or whatever it is, if they don't meet the burden of proof on any element, the result is the same.

* * *

And – and I guess that's the end of the story because – I mean, the end of the question because the jurors look at this and say, well, you know, if I find the guy not guilty because he hit him in the head with an ax instead of shooting him with a gun, the guy goes home, you know, and it's all over. Then I'm – I'm in a position of letting somebody off on a murder that I know that he committed, it's just because of some oversight, mistake or vagary of the proof that I'm being required to do that.

And it takes a certain degree of mental discipline and fortitude in order to do that in that circumstance. You see what I mean?

A. Yes, sir.

After counsel finished questioning Griffin, he challenged him for cause, asserting that the court erred by restricting the voir dire and not allowing him to ask Griffin his understanding of the term, "reasonable doubt." The challenge for cause was denied. Counsel had already exhausted his peremptory challenges, and so he moved for an additional peremptory challenge, asserting that Griffin was an objectionable juror, and that if he had an additional peremptory challenge, he would exercise it on Griffin. The trial court denied this motion. Griffin was seated as the twelfth juror.

Appellant's proffered questions concerned a proper area of inquiry. Arguably, these questions were not repetitive because, when counsel asked them, Griffin had not yet been asked to provide his definition of reasonable doubt. However, a review of the whole voir dire reveals that the parties covered this area of inquiry thoroughly, and Griffin responded to their questions without equivocation. Griffin clearly stated that he would require the State to prove every element of the offense, and the first two punishment issues, beyond a reasonable doubt. Both parties explained the State's burden of proof, and Griffin affirmed that he understood this burden and that he would hold the State to it. When the State's objections to the proffered questions were sustained, counsel discussed the mental discipline and fortitude that might be required to hold the State to its burden of proving every element as charged. Griffin again affirmed that he understood and would follow the law.

Even assuming that the trial court erred by sustaining the State's objections to the proffered questions, appellant was not harmed. A review of the entire voir dire reveals that Griffin's understanding of "reasonable doubt" would not render him challengeable for cause. He affirmed that he understood the parties' explanations of the State's burden of proof and that he would set aside his personal views and follow the law. *See Murphy,* 112 S.W.3d at 597-98; *Wheatfall,* 882 S.W.2d at 835. Griffin's answers to the proffered questions might have informed the intelligent exercise of a peremptory challenge, but appellant had already exhausted his peremptory challenges when Griffin came before the court for questioning. Appellant was not entitled to receive additional peremptory challenges. *See* Art. 35.15(a), (d); *Hogue v. State,* 711 S.W.2d 9, 28 (Tex. Crim. App. 1986) (whether to grant additional peremptory challenges is within the trial court's discretion). Accordingly, even assuming that the proffered questions were denied in error, appellant was not harmed.

Points of error four and five are overruled.

## *BATSON* CHALLENGE

In his sixth point of error, appellant alleges that the trial court erred in overruling his *Batson*[11] objection to the State's use of a peremptory challenge on prospective juror Curtis Patterson, an African-American. Appellant argues that the State's proffered race-neutral reasons for challenging Patterson are not supported by the record and are

---

[11] *Batson v. Kentucky,* 476 U.S. 79 (1986).

insufficient to rebut the *prima facie* case of racial discrimination. Appellant further argues that he demonstrated that the prosecutor's proffered reasons were merely a pretext because defense counsel proved "that several white jurors preferred rehabilitation but were not challenged by the state and that no juror was sleeping."[12]

A defendant objecting under *Batson* must make a *prima facie* showing of racial discrimination in the State's exercise of its peremptory challenges. *See Batson,* 476 U.S. at 106; *see also Mathis v. State,* 67 S.W.3d. 918, 924 (Tex. Crim. App. 2002). The burden then shifts to the State to articulate race-neutral explanations for its strikes. *Mathis,* 67 S.W.3d at 924. Once the prosecutor has articulated race-neutral explanations, the burden shifts back to the defendant to show that the explanations are a pretext for discrimination. *Id.* The trial court must then determine whether the defendant has carried his burden of proving discrimination by a preponderance of the evidence. *Id.*; *see also Watkins v. State,* 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). This step of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, in which the trial court's firsthand observations of the demeanor of the prosecutor and, frequently, the demeanor of the prospective juror are of great importance. *Snyder v. Louisiana,* 552 U.S. 472, 477

---

[12] Appellant asserts that defense counsel proved "that several white jurors preferred rehabilitation but were not challenged by the state and that no juror was sleeping." However, defense counsel never mentioned during voir dire that white jurors who "preferred rehabilitation" were not challenged by the State, and the record is devoid of any reference to a sleeping juror. Appellant has not identified any non-African-Americans who served on the jury and who were similarly situated to Patterson.

(2008). The ultimate burden of persuasion regarding racial discrimination never shifts from the defendant. *Purkett v. Elem,* 514 U.S. 765, 768 (1995).

When the prosecutor has articulated race-neutral explanations and the trial court has ruled on the ultimate question of discrimination, the issue of whether an appellant established a *prima facie* case becomes moot. *Cantu v. State,* 842 S.W.2d 667, 689 (Tex. Crim. App. 1992). On appeal, the trial court's determination is accorded great deference and the trial court's ruling will not be disturbed unless it is clearly erroneous. *Gibson v. State,* 144 S.W.3d 530, 534 (Tex. Crim. App. 2004); *Mathis,* 67 S.W.3d at 924.

Here, during the State's voir dire, Patterson indicated that he had previously served on juries in criminal cases but he had never been called upon to reach a verdict because the cases were always dismissed or the parties reached a plea agreement. He did not recall that any of those cases involved an offense more serious than a traffic ticket. He indicated that his sister had once been employed as a jailer. Patterson did not express any confusion or hesitation about finding a defendant guilty in a capital case if the State proved the elements of the charged offense beyond a reasonable doubt.

The questioning then focused on the requisite mental state for capital murder and the parties issues at guilt and punishment, and Patterson indicated that he understood the prosecutor's explanations. When the prosecutor's questioning turned to the future dangerousness issue, Patterson's responses revealed no confusion or hesitation. However, when the State asked Patterson whether he could keep an open mind in

deciding whether to give an affirmative or negative answer to the mitigation issue,

Patterson returned to the topic of future dangerousness:

Q. Okay. You – you will receive an instruction that a mitigating circumstance is a circumstance or evidence that a juror might regard as reducing the person's moral blameworthiness. Okay?

A. Uh-huh.

\* \* \*

Q. But if you've answered those first two questions yes, you get this question. All right? And when you get to this question, it's asking you to step back and review all the evidence.

Some people might say, You know what? I found him guilty, I said he was a future danger, and he meant that this person die. Okay?

A. (Moving head up and down.)

Q. In their mind, there's never going to be something that outweighs all of that, okay –

A. Uh-huh.

Q. – that's sufficiently mitigating to warrant a life sentence. Okay?

A. (Moving head up and down.)

Q. Do you think that this is a question, depending on the circumstances, that could be answered yes or no?

Or is that one you'd be inclined, if you got this far, to answer it no so the death penalty resulted?

Or let me ask you the reverse. Would you be inclined at this point to always want to answer that yes to spare somebody the death penalty?

A. It has a lot to do with – if the person, to me, is going to go out and do all this over again, if – it has a lot to do with, you know, just like I say, his background, everything. Because this all has to play in there whether he's going to continue to do this.

Q. Okay. Remember, I don't have to prove he's going to kill again. All right?

He's – you know, a life sentence would be that he be locked up the rest of his life.

A. Well, I can – you know, I can see a life sentence for all that's been done, but as far as if you give him the death penalty, that's – you going to have to – you know, to me, I have to see it in my mind that he's going to be worse in the – in the prison system and go out there and hurt the population in the prison system to even go death penalty.

Q. Okay. So are you saying that I would have to – well, I mean, you remember in the first question you would have answered that you felt that he was a future danger, that he'd continue to commit criminal acts –

A. Right.

Q. – of violence, okay?

A. I mean, you can always do that in the prison system, too.

Q. So – okay.

So do you think that's something I would be – ever be able to prove to you, knowing that he would be locked up for the rest of his life?

I mean, would you require me to prove – I mean, you already required me to prove – or I'm required to prove that first question should be yes. Okay?

A. Uh-huh.

Q. But I want to make sure I understood your question – I mean, your – your answer that – when you said that I would have to prove it to you that he would continue to do this in prison?

A. Well, see, it's – it's just like that. Prison system is a population, too. It's just they're locked down.

Q. Uh-huh.

A. I mean, if you're going to go into the prison system and take lives, I mean, that tells me that it doesn't make any difference where you are, inside or out. That would probably be – I would lean – lean more towards, you know . . .

Q. Lean toward – more as toward what?

A. The – the death penalty.

If – if you cannot control yourself inside as well as, you know, what you're doing outside, I'm just saying I'm more likely to sign on as far as the death penalty goes.

Q. Okay.

A. But if you – you're already going to the prison and you've already, you know, kind of repented, then I'm more likely to see you as – you know, just go ahead and – and have him in there the rest of his life, and he's not going to hurt anybody else while he's in there.

Q. Okay.  Because he's been behaving?

A. Yeah.

Q. Okay.  And that – that would make you more likely than not to – to choose life over death?

A. More likely.

Q. And do you have any questions on that particular question?

A. (Moving head side to side.)

Q. Have I explained it adequately?

A. Well . . .

Q. I know that's a dangerous question.

A. Yeah.  You – but as far as I'm concerned, I mean, there's a population inside prison, there's a population outside of prison.  And the person shows repentance as he's going to prison and I know he's not going to hurt anybody else, well, then, you know, life sentence seems reasonable.

Now, did I confuse you?

Q. I'm not sure.

So I guess what you're telling me is that you'd need a pattern of conduct or threat of violence before you could ever answer that question?

A. No, not really.  I – you know, I mean, if he's proved that – you can prove that he's done the deed and he's guilty of it, I can find him guilty, you know.

Q. Right.

A. Give him a life sentence.

Now, if he's a real bad character to the point where he's rabid and he's going to hurt even the prison population, you know, there's no point – you already convicted him. All you can do is give him life, okay, sentence.

He gets in there, he decides, I'm already here, might as well kill a few people while I'm here, hey, just go ahead and give him the death penalty and be done with it.

Q. Okay. Just so I – I mean, are you saying that you want me to show you that he'd kill again?

A. No, no, no.

Q. Okay.

A. His – his – his behavior –

Q. Okay.

A. – up to this point will tell you that, you know. That he's going to go and do his time and he's going to do whatever he has to do and – and act accordingly while he's there. Okay?

Q. Uh-huh.

A. And then, you know, he's not going to be a danger to anybody else in the prison system because you still got wardens, guards, and everything else.

And if he's likely to hurt people outside for just a few dollars, and he has no, you know, conscience, no repentance over that, then you put him into a prison system and he's going to take out a guard, regardless.

You see what I mean?

Q. Uh-huh.

A. Well, I'm – you know, then that person, to my mind, is – you know, is more likely to need the death penalty.

Q. Uh-huh.

I guess – you – you used the – take out a guard or – or kill again in prison.

A. Yeah, because he – my – that could easily have been my sister.

Q. Okay.

A. You see what I mean?

Q. Yeah.

I'm just curious how someone could prove that to you.

Q. Well –

MR. RAY: Judge, I'm going to object to asking for a specific set of facts. That would be binding.

THE COURT: Okay. I'll sustain the objection.

Q. (by Mr. Foran) Do you think that's some – well, based on your answers, are you going to require the State to prove to you that he would kill again?

MR. RAY: I object again. That's binding.

THE COURT: I'll sustain the objection again. I think he's answered that anyway, but I'll sustain the objection to the question that's being asked.

Q. (By Mr. Foran) Well, let's go back to the question number one, then, where we – you know, where we would have to prove to you that a person would commit criminal acts of violence.

In your mind, criminal acts of violence, would that mean that someone would have to kill again?

MR. RAY: I object again, Judge. It's binding.

MR. FORAN: Well –

MR. RAY: Kill again.

MR. FORAN: I'm entitled – I'm entitled to ask him his understanding.

MR. RAY: No, he's not.

MR. FORAN: Yes, I am.

MR. RAY: Kill – kill again is a binding question. He can ask him about acts of violence, but he cannot –

THE COURT: I'll sustain the objection to it.

MR. RAY: Thank you.

Q. (By Mr. Foran) I mean, you've repeatedly said on several occasions about whether or not someone would kill in prison. Okay? Is that right?

A. Uh-huh.

Q. Is that a yes? Because she's typing down everything you say.

A. Yes. I said yes.

Q. Okay. And so I'm trying to understand your – your response as it relates to this question here.

A. Okay. If – if there's a reasonable doubt that he's not likely to commit any criminal acts, I – I don't see it.

Q. Okay.

A. You know, I mean, if he's already done this and you can prove it to me, well, then I'm going to judge him accordingly as far as guilty. But –

Q. We're past that stage here.

A. Okay. I understand that.

But if he's – his behavior is so bad that if he's in the penal system that he's likely to hurt someone else, you know, why are you going to put him into a situation where he's going to go and hurt someone else in the penal system? You know what I mean?

Q. Well, and you said, "hurt someone else." Okay?

A. As far as taking a life.

Q. Taking another life?

A. Yeah.

Q. Okay.

A. And in – in that – in that venue.

Q. So that's what it means to you?

A. Yeah.

The prosecutor then began discussing the lesser-included offense of murder, but before he could pose any more questions, the trial court informed him that his hour was up and that he needed to "finish up real quick." The prosecutor then asked Patterson for his date of

birth and whether he had ever lived on Willie Street. The trial court then recognized the defense.

Defense counsel asked Patterson about his affirmative response on the questionnaire to Question Number 82, whether innocent people ever get convicted of crimes, and his written explanation that "back then we didn't have DNA." Patterson explained that it seemed that a lot of previously convicted people were being exonerated by DNA evidence, especially in rape cases. He did not express any confusion or hesitation about counsel's explanation of the State's burden of proof, the punishment questions, and the need for jury unanimity.

At the conclusion of defense counsel's questioning, the prosecutor challenged Patterson for cause, asserting that Patterson would increase the State's burden of proof and that he could not impose the death penalty unless the State proved that the defendant would murder again. Defense counsel responded that he did not think Patterson had "said all that." The court agreed with defense counsel and denied the State's challenge for cause. The prosecutor then exercised a peremptory challenge. Defense counsel requested a *Batson* hearing, noting for the record that Patterson and the defendant were both African-American.

The prosecutor then noted for the record that only two prospective jurors who had previously come before the court for questioning were African-American. One had been seated on the jury and the other had been disqualified by her views on the death penalty.

The prosecutor then explained his reasons for exercising a peremptory strike against Patterson.

The prosecutor's first reason for striking Patterson was that he would increase the State's burden of proof with respect to the future dangerousness question, in that he would define the issue in terms of the probability that the defendant would murder someone in the prison system. He would require the same type of evidence before he would give a negative answer to the mitigation question. Based on the facts of this case, where the defendant had a limited or nonexistent history of bad behavior while in custody, the State could never prove to Patterson's satisfaction that the answers to the punishment questions should result in the death penalty. Patterson's questionnaire was consistent with this view, in that he listed "mass murderers" as the best argument in favor of the death penalty.

The second reason the prosecutor struck Patterson was that he indicated a general distrust of the criminal justice system on his questionnaire. To Question Number 37, which asked the prospective juror to explain why a life sentence might be appropriate in some cases, Patterson answered, "Depending on whether you can afford a good lawyer." Similarly, to Question Number 46, which asked for the prospective juror's "personal opinion about the criminal justice system and the way that it works," Patterson answered, "If you have enough money for a good lawyer, you have a chance to win." The prosecutor asserted that this answer was similar to the answer of another juror, who had

stated on his questionnaire that the criminal justice system was corrupt and who had been excused by agreement.

The third reason the prosecutor struck Patterson was his answer to Question Number 49 on the questionnaire, in which he ranked "punishing a person" as the least important purpose of the criminal justice system. The prosecutor preferred jurors who ranked punishment as the most important purpose.

The fourth reason the prosecutor struck Patterson involved his previous jury service. Patterson had previously served on a jury in a criminal trial in which the defendant was charged with aggravated robbery with a deadly weapon. In that case, the jury acquitted the defendant. The prosecutor had a policy in felony cases of striking any venireperson who had ever served on a jury that found a criminal defendant not guilty. Additionally, the prosecutor was troubled by Patterson's failure to mention that case when the prosecutor questioned him about his previous jury service.

Defense counsel then questioned the prosecutor about this fourth explanation for striking Patterson. During this questioning, it became apparent that in order to discover that Patterson had previously served on a jury that acquitted a defendant of aggravated robbery with a deadly weapon, the prosecutor had cross-referenced a jury record obtained from the county against a jury record that the district attorney's office maintained. Counsel noted for the record that the prosecutor had refused to provide him with the district attorney's jury records, and that when counsel had moved to compel production of

these records, the trial court had denied the motion, ruling that these records were privileged attorney work product. The prosecutor then indicated that he would provide counsel and the court with copies of the records on which he was relying to strike Patterson.

Once the State articulated race-neutral reasons for striking Patterson, the burden shifted back to the defendant to show that the State's explanations were a pretext for discrimination. Concerning the State's first stated reason for the strike, defense counsel argued that Patterson never said that he would increase the State's burden of proof. Concerning the State's second and third reasons for striking Patterson, counsel argued that although Patterson's questionnaire answers were potentially viable reasons for exercising a strike, the prosecutor did not question Patterson about these answers, and they were not "borne out by" what Patterson "said in fact" during voir dire. Concerning the State's fourth reason, counsel noted that he had no way to confirm the accuracy of the district attorney's jury record, which was based on information that prosecutors entered after jury selection. Counsel clarified that he was not disputing the accuracy of that record, but was pointing out that the defense did not have access to it.

The trial court found that Patterson was not disqualified by his answers but that "he obviously said some things that the State would be very concerned with. . . . I think the State has its neutral reasons and I'm going to deny the motion, the Batson motion." Patterson was then excused.

The trial court did not specify which of the State's four explanations constituted sufficiently race-neutral reasons. However, all of the State's explanations were facially race-neutral. "[W]hen the State has offered more than one plausible reason for striking a venireperson, it is proper to review these reasons in their entirety in order to assess whether the State's explanation was valid or merely pretextual." *Cantu v. State,* 842 S.W.2d 667, 689 (Tex. Crim. App. 1992).

Here, it appears that the State's reasons were reasonable and credible bases for exercising a peremptory challenge. *See, e.g., Mines v. State,* 852 S.W.2d 941, 946 (Tex. Crim. App. 1992), *vacated and remanded on other grounds,* 510 U.S. 802 (1993) ("the circumstances in this case present the precise situation where a peremptory challenge is appropriate, *viz:* the prospective juror is not challengeable for cause, but the prosecutor does not believe the venireperson will be a favorable juror for the State"). Patterson's answers during voir dire conveyed the impression that he would not answer the future dangerousness issue affirmatively unless he was persuaded that the defendant was likely to kill someone in prison, and his written questionnaire answers expressed his opinion that a criminal defendant's ability to obtain a favorable result depended on his ability to afford a good lawyer.[13] The trial court was in the best position to determine whether the

---

[13] The State's third explanation–that Patterson ranked punishment as the least important purpose of the criminal justice system–is somewhat problematic. The State failed to question Patterson about this ranking, and moreover the State did not strike four other prospective jurors who ranked "punishing the person" as the least important purpose of the criminal justice system. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an

(continued...)

State's explanations were sufficient and genuine, and this determination will not be overturned on appeal unless it was clearly erroneous. *See Gibson,* 144 S.W.3d at 533-34; *Jasper v. State,* 61 S.W.3d 413, 421-22 (Tex. Crim. App. 2001); *see also Watkins,* 245 S.W.3d at 447.

Taking into consideration all relevant circumstances, we find that the trial court's determination that appellant failed to prove discrimination is supported by the record and is not clearly erroneous. Point of error six is overruled.

## RECORDS OF PAST JURY SERVICE

In his seventh point of error, appellant alleges that the trial court erred by denying his motion for the State to provide records of prospective jurors' past jury service that were maintained in the district attorney's office.[14] He asserts that he was harmed because

---

[13](...continued)
otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Miller-El v. Dretke,* 545 U.S. 231, 241 (2005). On the other hand, when the State offers numerous race-neutral reasons for a peremptory challenge, "we cannot say that the fact that there were other acceptable jurors possessing one or more of these objectionable attributes, is sufficient to establish disparate treatment." *Adanandus v. State,* 866 S.W.2d 210, 225 (Tex. Crim. App. 1993).

Concerning the State's fourth explanation, appellant now asserts that Patterson's previous jury service is "not a sufficiently neutral reason to strike a juror." However, this argument is inadequately briefed because appellant offers only his bare assertion, in a single sentence, that Patterson's previous jury service is not a sufficiently race-neutral reason for striking him. *See* Tex. R. App. P. 38.1; *see also Watkins v. State,* 245 S.W.3d 444, 455 (Tex. Crim. App. 2008) ("prosecutors frequently exercise peremptory challenges to eliminate potential jurors who have acquitted criminal defendants in the past").

[14] In his motion, appellant asked the trial court to order the State to provide the defense with the State's prior histories of the prospective jurors summoned in this case. He requested

(continued...)

the State's failure to provide this information with respect to Patterson deprived the defense of an opportunity to test the veracity of one of the State's proffered race-neutral reasons for striking Patterson.

Appellant argues that the trial court erred because "the requested information is not privileged and its disclosure is mandated under the Texas Open Records Act." However, the trial court did not err by denying appellant's motion. *See Etheridge v. State,* 903 S.W.2d 1, 7 (Tex. Crim. App. 1994) ("We have previously held that 'the State has no obligation to furnish counsel for the accused with information he has in regard to prospective jurors.'" (quoting *Martin v. State*, 577 S.W.2d 490, 491 (Tex. Crim. App. 1979))), *superceded by statute on other grounds as stated in Diaz v. State,* 110 S.W.3d 181, 184 (Tex. App.–San Antonio 2003); *see also Enriquez v. State,* 429 S.W.2d 141, 145 (Tex. Crim. App. 1968).[15]

Moreover, the record does not support appellant's claim of harm. When defense counsel explained at the *Batson* hearing that the defense had not had an opportunity to verify the jury records on which the State was relying to strike Patterson, the prosecutor stated that he would provide the defense with those records. The record on appeal is

---

[14](...continued)
that these histories be provided to the defense after the venire was initially seated but prior to the time for the defendant to move for a jury shuffle.

[15] Arguably, once the jury service records with respect to Patterson were expressly cited by the prosecutor during the *Batson* hearing, the trial court would have erred by denying a defense motion to disclose those records. However, appellant does not allege, and the record does not show, that he moved for disclosure at that time.

silent as to whether the prosecutor ultimately provided those records. If Patterson's jury records were never provided to the defense, or if they were provided and defense counsel discovered that they did not support the prosecutor's proffered reason for striking Patterson, it was incumbent upon the defense to present this matter to the trial court and develop the record. *See, e.g., Word v. State,* 206 S.W.3d 646, 652 (Tex. Crim. App. 2006) ("It is usually the appealing party's burden to present a record showing properly preserved, reversible error"); *Whitehead v. State,* 130 S.W.3d 866, 872 (Tex. Crim. App. 2004) ("An appellate court may not consider factual assertions that are outside the record"); *see also Moore v. State,* 999 S.W.2d 385, 397-98 (Tex. Crim. App. 1999). The silent record on appeal does not support appellant's contention that the prosecutor never provided counsel with Patterson's jury records.

The State's brief on appeal construes appellant's claim to be that he was harmed by the State's failure to provide this information with respect to all prospective jurors. We do not read appellant's claim so broadly. In any event, we need not reach the matter because we have already held that the trial court did not err by denying appellant's motion. Point of error seven is overruled.

CONSTITUTIONALITY OF ARTICLE 37.071

In his twelfth and thirteenth points of error, appellant asserts, "Special Issue N[umber] Three of Article 37.071 [(the mitigation issue)] is unconstitutionally vague and indefinite," in violation of his rights under the Fourteenth Amendment to the United

States Constitution and Article I, Section 19, of the Texas Constitution. In his fourteenth and fifteenth points of error, appellant claims that the trial court erred in overruling his Motion Number 45, "Defendant's Supplemental Motion to Declare the Texas Death Penalty Procedure and Article 37.071, Texas Code of Criminal Procedure Unconstitutional," because Article 37.071 violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 13, and 19, of the Texas Constitution. In his sixteenth point of error, appellant claims, "The Texas death penalty scheme violates appellant's right to due process under the United States Constitution because the punishment special issue relating to mitigation fails to require that the State prove the absence of sufficient mitigating circumstances beyond a reasonable doubt."

We have previously rejected these claims. *See Busby v. State,* 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); *Russeau v. State,* 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); *Sells v. State,* 121 S.W.3d 748, 767-68 (Tex. Crim. App. 2003); *Brooks v. State,* 990 S.W.2d 278, 288 (Tex. Crim. App. 1999); *Raby v. State,* 970 S.W.2d 1, 9 (Tex. Crim. App. 1998). Appellant raises nothing new to persuade us to reconsider them. Points of error twelve through sixteen are overruled.

We affirm the judgment of the trial court.


Delivered: October 6, 2010
Do not publish